[No. H032497. Sixth Dist. Aug. 4, 2009.]

THE PEOPLE, Plaintiff and Respondent, v.
SAMMY DANIELS, Defendant and Appellant.

306

COUNSEL

Julie Schumer, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Rene A. Chacon and Linda M. Murphy, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

MIHARA, J.—Defendant Sammy Daniels was convicted by jury trial of kidnapping for rape (Pen. Code, § 209, subd. (b)(1)), and allegations of numerous prior convictions (Pen. Code, §§ 667, subds. (a), (b)–(i), 1170.12) and prison priors (Pen. Code, § 667.5, subd. (a)) were found true. He was committed to state prison for a term of 28 years to life consecutive to a 21-year term. On appeal, he contends that the trial court prejudicially erred in (1) admitting evidence that he had committed a prior rape in 1990, (2) excluding defense expert testimony on alcoholic blackouts, (3) misinstructing the jury on the elements of kidnapping for rape where the victim was incapacitated, and (4) imposing a $40 court security fee rather than a $20 court security fee. The Attorney General concedes that the court erred in regard to the court security fee. We conclude that Penal Code section 209, subdivision (b)(1) extends to a taking and asportation of an incapacitated person to commit rape where the perpetrator uses only the amount of force necessary to effect the taking and asportation of an incapacitated person, rather than "something more" than that amount of force. We therefore find no instructional error. We accept the Attorney General's concession that the court security fee must be reduced to $20 and reject the remainder of defendant's contentions.

## I. Factual Background

On Saturday, August 27, 2005, 21-year-old S.D. (S.) spent the evening with her friend J.H. (J.) and J.'s older sister T.H. (T.). The three women socialized at T. and J.'s parents' house for a while, and S. and J. each drank a number of shots of vodka or rum.[1] Then, T. drove the three women to downtown Palo Alto so that they could go "bar hopping." The first bar they visited was Old Pro, where S. had one or more "Jager bombs" and shared a mixed drink with

---

[1] S., who was five feet five inches tall and weighed about 135 pounds, may have consumed as many as 10 shots at the house.

a male friend she encountered.[2] After spending half an hour at Old Pro, they proceeded to Nola's, which was next door to Old Pro. At Nola's, S. had a few more "Jager bombs." Their next destination was a bar called Fanny & Alexander's, which was a couple of blocks away from the other two bars. At the entrance to Fanny & Alexander's, T. had a dispute with the bouncer over payment of the cover charge. Defendant, a 51-year-old man who was standing nearby, offered to pay the cover charge for the three women, and they accepted the offer.

The women went inside the bar and immediately went to the bathroom, as S. was feeling sick. Her indisposition was due to the fact that she had consumed "probably around 13 shots" of alcohol over a period of three to four hours.[3] S. vomited in the toilet while they were in the bathroom. They came out of the bathroom and briefly socialized with some men they knew. It was near closing time when they arrived at Fanny & Alexander's, and they left the bar at closing time, which was 2:00 a.m. At this point, both S. and J. were intoxicated, but were walking and talking normally.

Once they exited Fanny & Alexander's, S. left J. and T. and ran across the street into a parking lot to vomit. J. lost sight of her. When S. did not return within a couple of minutes, J. ran across the street and looked for her, but she could not find her. T. and J. tried calling S. on her cell phone numerous times, but there was no answer. T. and J. walked around looking for S. for another 10 to 15 minutes, but did not find her. They finally assumed she had found a ride with another friend, and they went home.

S. had gone into an alley on the side of the parking lot across the street from Fanny & Alexander's. She lost consciousness, and the next thing she remembered was waking up to find herself lying on the ground in the alley. She heard her cell phone ringing "a lot of times," but "I just could only, like lie there and throw up, really." S. heard defendant's voice talking to her as she was lying on the ground facedown. Defendant asked her if she was "okay." She did not respond. Since her phone had stopped ringing, S. thought that perhaps defendant had answered it and was going to bring her to her friends. S. continued to throw up "and then somehow I ended up in a car." S. thought defendant had driven up to where she was lying. She had no recollection as to how she got in the car, and she had not agreed to get in the car.[4]

S. vomited out the window of the car. S. continued to alternate between a state of unconsciousness and a state of being "out of it." "I was, like, in and

---

[2] A "Jager bomb" is a mixture of Jagermeister liquor and Red Bull.

[3] S. testified that this was a "pretty normal amount" of alcohol for her to consume.

[4] At trial, on cross-examination, S. acknowledged that she had told the police that she "got into the car with him because he said 'Oh, your friends want me to take you to them.' "

out of being passed out and throwing up, wake up only to throw up and then passing out again." She noticed that the car was moving. At one point, when S. was vomiting out the car window, she noticed that the car was at a gas station. She "couldn't physically get out" of the car, because she was unable to "move or talk." S. felt someone touching her "[u]nder my shirt on my breasts." She was "pretty sure" that her "skin" was being touched.[5] S. did not know whose hands were touching her, but she was "pretty sure" that this person was in the car with her. S. was "scared" and did not know what to do. She fell back to sleep.

Defendant, who lived in an apartment in Hayward and worked in Mountain View, arrived at the Super 8 Motel in Hayward between 2:00 and 3:00 a.m. Hayward is 20 miles from downtown Palo Alto, a distance that takes about 30 to 45 minutes to drive in the absence of traffic. Defendant's Hayward apartment was about a mile and a half from the Super 8 Motel. Defendant entered the motel office and filled out a registration card, and the motel clerk wrote down defendant's driver's license number on the card. Defendant signed the card with his Muslim name "Ali Bilal." Defendant told the clerk that the room was for him and his wife.

The next thing S. remembered after falling back to sleep in the car was "being carried somewhere and then laid down on the bed in a hotel room." S. kept her eyes closed because she was "scared and I didn't know what to do." She heard defendant say "I'll be right back" and leave the motel room. As soon as he left the room, S. opened her eyes. Suddenly, she felt able to move and speak again. S. "totally freaked out and got up and ran out of the room." At some point, S. had lost both her purse and her shoes.[6] She ran into the motel's parking lot and approached two young male strangers.

James Elder and Gary Casupang, young men in their mid-20's, had checked into the Super 8 Motel in Hayward between 2:00 a.m. and 3:00 a.m. on August 28, 2005. As they were parking their car, they saw a large maroon car parking nearby. A few minutes after arriving at their room, they went back out to their car to turn off the car's interior light. As they approached their car, they heard a woman's voice behind them yelling repeatedly "Help." Elder looked around and saw S. running toward them from the motel building. She looked "scared" and "traumatized." Elder and Casupang had never seen S. before.

---

[5] At trial, on cross-examination, S. testified that she could "barely recall" the breast touching and it was "kind of like a flashback." She "didn't remember it at first, and then I remembered it after."

[6] She had taken her shoes off when she came out of Fanny & Alexander's and was carrying them because they hurt her feet.

S. was breathing heavily and seemed "quite hysterical." Elder saw defendant "running behind her and chasing her." S. reached them, "latched herself onto" Casupang's arm, and told Casupang "I've been kidnapped." She asked them to help her, and Elder and Casupang agreed to do so. They took her to their car. Defendant stopped chasing her, "backed off a bit," and "lingered" near a maroon car by the motel building. He crouched down and watched them.

Elder, Casupang and S. got into their car and drove away. Elder and Casupang told S. that they were "[n]ear Oakland," and S. was "horrified." S. did not seem intoxicated. S. asked Elder and Casupang to take her to Palo Alto. She told them that she had gone out to a bar in Palo Alto with some friends. She said she was kidnapped when she went outside the bar to use her phone. S. said that the man who had kidnapped her had tried to sexually assault her. She provided no details.

Ten minutes after checking into the Super 8 Motel, defendant returned to the motel clerk, said "My wife disappeared," and asked the clerk for a refund. Because this was within the motel's "grace period," the clerk returned defendant's money to him. The clerk suggested that defendant call 911, but defendant said "there is no need." Defendant scratched out his driver's license number on the registration card and left. The clerk saw defendant drive away in a maroon car.

Elder and Casupang took S. back to Palo Alto. S. went to the Palo Alto Police Department with her mother about 6:00 a.m. S. was interviewed by two police officers. The one-hour interview was interrupted four or five times for S. to go to the bathroom due to her nausea. S. did not seem intoxicated.

On the morning of August 30, 2005, defendant brought S.'s purse to the Palo Alto post office. He told the postal clerk that he had found the purse in the parking lot. The clerk told defendant that they had a lost and found and would try to return the purse to its rightful owner. The post office notified S., and she retrieved her purse. S.'s cell phone, wallet, identification, credit cards, money, and keys were in the purse along with a small spiral notebook. S. noticed that a note had been written inside her notebook.

This note, which had been written by defendant, read: "S[.], sorry about that night. You were so drunk, you couldn't tell me or show me where you lived, so I paid for a motel as a safe haven for you. You disappeared on me. I guess you were in fear. I wasn't gonna hurt or harm you or violate you. You are so pretty. I hope you learned a lesson. You should never drink again. [¶] What had I been a seria [sic] killer or a rapist? You could have been killed or raped. This should be a serious lesson for you. I wish I could see you before

you're off to school. You're such a beautiful woman; so fine. Excuse me. I wish you success in your endeavors. Study Islam and the history the Koran. [¶] Your success is in the religion of Islam Sunni Muslim. You take care of your soul, baby girl. Allah bless your stranger."

Defendant was eventually identified by his driver's license number from the motel registration card. He was arrested on November 21, 2005. He was driving a maroon four-door 1996 Plymouth. S.'s DNA was found in the front passenger area of the Plymouth. A document in the Plymouth identified defendant as "Brother Bilal." Defendant had been convicted of a 1990 Palo Alto rape.

## II. Procedural Background

Defendant was charged by information with kidnapping for rape (Pen. Code, § 209, subd. (b)(1)), kidnapping (Pen. Code, § 207, subd. (a)), and sexual battery (Pen. Code, §§ 242, 243.4, subd. (a)). It was further alleged that he had suffered seven prior strike convictions (Pen. Code, §§ 667, subds. (b)–(i), 1170.12) and three prior serious felony convictions (Pen. Code, § 667, subd. (a)), and had served prison terms for two prior violent felony convictions (Pen. Code, § 667.5, subd. (a)).

The prior conviction and prison prior allegations were bifurcated. Defendant expressly conceded identity at trial. Evidence of defendant's 1990 rape offense was admitted at trial over defendant's objection. The parties agreed that the simple kidnapping count was charged only as a lesser included offense of the kidnapping for rape count, and the jury was instructed accordingly.

The jury deliberated for one full day before reaching its verdicts. It found defendant guilty of kidnapping for rape and acquitted him of the sexual battery count.[7] The jury and the court made true findings on the prior conviction and prison prior allegations. Defendant was committed to state prison to serve an indeterminate term of 28 years to life consecutive to a determinate term of 21 years. He was also ordered to pay a court security fee of $40. Defendant filed a timely notice of appeal.

---

[7] The jury reached no verdict on the simple kidnapping count as it had been instructed not to return a verdict on that count if it convicted defendant of the kidnapping for rape count. The jury had been instructed that the sexual battery count required proof that "defendant unlawfully restrained" S. and that the touching occurred "while [S.] was restrained."

## III. Discussion

### A. Admission of Evidence of Prior Rape

Defendant contends that the trial court prejudicially erred in admitting evidence of defendant's 1990 rape offense[8] under Evidence Code sections 1101, subdivision (b) and 1108.

#### 1. Background

Both the prosecution and the defense sought an in limine ruling on the admissibility of evidence that defendant had committed a 1990 rape. The prosecution presented a summary of the facts of that offense. These facts included that defendant had told the victim "that this was a simple burglary and if she cooperated she would not get hurt." When she resisted his physical assault, he bit her deeply on the shoulder. The victim began praying, and defendant told her to stop praying, and threatened to break a bottle over her head if she did not comply. Defendant told the victim that he had seen her at a downtown Palo Alto bar on Halloween a few nights earlier, had followed her home, and had watched her activities that evening. Defendant was convicted of two counts of rape. He was released from prison on parole in late October 2004, less than a year before the events leading to the current kidnapping for rape prosecution.

The defense interposed an Evidence Code section 352 objection and argued that the 1990 rape was not similar to the current offense and that the admission of the prior rape would be unduly prejudicial. The prosecutor claimed that any prejudice to defendant from the admission of evidence of the prior rape was not undue. "The issue in this case, the big issue, is was he up to no good? Was he trying to rape her that night, S[.], or was he trying to help her? That's the whole case. The whole case will rise or fall on that issue."

The court weighed all of the relevant factors and admitted the prior rape evidence under Evidence Code section 1108 to show propensity and under Evidence Code section 1101, subdivision (b) to show intent. The court found that the prior rape and the current charges were similar and "of the same class and nature." Both offenses were sexually oriented. The prior offense was a rape, and the current offense had sexual overtones that were demonstrated by the alleged sexual battery and the taking of S. to a motel room and placing

---

[8] Although defendant committed two rape offenses in 1990 and was convicted of two counts of rape, we will refer to the 1990 rapes in the singular as the parties did below and continue to do on appeal.

her on a bed. Both the prior and current offenses were committed in the early morning hours on a weekend, and the victims were young women in their 20's. Both women were first observed by defendant at a bar in downtown Palo Alto and "followed until they were alone." Both victims initially were led to believe that they would not be harmed. Both women were isolated in a bedroom on a bed. On both occasions, a phone may have been disabled. The prior rape was relevant to show defendant's intent and was not remote in time, given that defendant had been in prison for the prior rape until less than a year before the current offenses. There was no uncertainty about defendant's guilt of the prior rape, as he had admitted it. Defendant had been convicted and punished for the prior rape, so the jury would not be inclined to punish him for the prior offense, and he would not need to defend against that offense. The court also concluded that the admission of evidence of the prior rape would not involve an undue consumption of time.

N.D. (N.), the victim of the 1990 rape, testified at trial. On November 4, 1990, N. was living in a duplex six blocks from downtown Palo Alto. During the early morning hours of that Sunday, N. was asleep in her clothes in her upstairs bedroom when she was awakened by a noise. N. saw a person standing in the doorway. She called out her roommate's name, but there was no answer. N. was scared so she pretended to be asleep. She felt someone on top of her, and her comforter was pulled over her head. Defendant, who was on top of her, told her that she "wouldn't get hurt" if she did what he said.

Defendant told N. that he had seen her in downtown Palo Alto at a Halloween party at a bar a few days earlier. He had followed her home after the party and watched her activities that evening. Defendant accurately described how he had seen her eat and change into a nightgown "with little purple flowers."

Defendant started to tear N.'s pants, and she tried to scream. He put his hand over her nose and mouth so that she could not breathe. N. thought she was going to die because she was losing consciousness. Defendant took his hand off her mouth and nose, put a sock in her mouth, and told her to stop screaming. He tied a piece of clothing around her eyes so that she could not see. Defendant also tied her hands behind her back. Defendant removed her pants and underwear, and she heard him put on a condom. He raped her and then went into the bathroom. He returned and raped her again. Defendant also put his mouth on her breast. After the second rape, defendant tried to wipe down the wallpaper. He told N. that he "wished we could be friends . . . ." He removed her blindfold and gag. Defendant was with N. for about four hours.

During her 20 minutes of trial testimony, N. was "extremely emotional and crying." The prosecutor introduced documentary evidence that defendant had

been convicted in 1996 of two counts of rape for his 1990 attack on N. He also introduced a transcript that showed that defendant had admitted raping N.

Immediately after the introduction of this evidence of the 1990 rape, the court instructed the jury regarding its usage of this evidence. "The People presented evidence that the defendant committed the crimes of rape that were not charged in this case. You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant, in fact, committed the uncharged offenses. [¶] Proof by preponderance of the evidence is a different burden of proof from proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true. If the People have not met this burden of proof, you must disregard this evidence entirely. [¶] If you decide that the defendant committed the uncharged offenses, you may, but are not required to, conclude from the evidence that the defendant was disposed or inclined to commit sexual offenses, and based on that decision, also conclude that the defendant was likely to commit the crimes charged in Count 1 and Count 3 as charged here, which are the kidnap to commit rape and the sexual battery charge. [¶] If you conclude that the defendant committed the uncharged offenses, that conclusion is only one factor to consider along with all of the other evidence. It is not sufficient by itself to prove that the defendant is guilty of the crimes charged in Counts 1 and 3. The People must still prove each element of every charge beyond a reasonable doubt. Do not consider this evidence for any other purpose."

This instruction was followed by a similar instruction that permitted the jury to use this evidence "for the limited purpose of deciding whether or not the defendant acted with the intent for the crimes charge[d] in Counts 1, 2, and 3 that are charged in this particular case." The trial court repeated both of these instructions at the conclusion of the trial.

The prosecutor relied on the 1990 rape in his argument to the jury in connection with the issue of defendant's intent. "This is important. I'm not asking you to say, 'Well, he was convicted of rape before, so let's convict him this time.' No. The prior rape is being used to show you what his intent was gonna be this time; to prove the element of intent; that his plan, his intent was to commit rape again, and to show you his disposition to commit sex crimes. [¶] His character. That's what the law is. It allows you to hear about what he's done before and to consider it to determine what type of guy is Sammy Daniels. Is he a good guy, or is he a predator? What would he do when given the opportunity."

## 2. Analysis

■ Evidence Code section 1108 permits the admission of evidence of a defendant's commission of an uncharged sexual offense to prove disposition in a current sex offense prosecution. (Evid. Code, § 1108, subd. (a).) Evidence Code section 1101, subdivision (b) permits the admission of evidence of a defendant's uncharged act "when relevant to prove some fact (such as . . . intent . . .) other than [the defendant's] disposition to commit such an act." (Evid. Code, § 1101, subd. (b).) The admissibility of evidence under either or both of these statutes is limited by Evidence Code section 352. (*People v. Lewis* (2001) 25 Cal.4th 610, 637 [106 Cal.Rptr.2d 629, 22 P.3d 392]; Evid. Code, § 1108, subd. (a).)

Defendant contends that evidence of the 1990 rape was not admissible under Evidence Code section 1101, subdivision (b) and should have been excluded under Evidence Code section 352 as substantially more prejudicial than probative.[9]

The 1990 rape was admissible under Evidence Code section 1101, subdivision (b). The prosecution sought to use the prior rape to prove that defendant harbored the intent to rape when he transported S. from Palo Alto to the Hayward motel. "The least degree of similarity (between the uncharged act and the charged offense) is required in order to prove intent." (*People v. Ewoldt* (1994) 7 Cal.4th 380, 402 [27 Cal.Rptr.2d 646, 867 P.2d 757].) "In order to be admissible to prove intent, the uncharged misconduct must be sufficiently similar to support the inference that the defendant ' "probably harbor[ed] the same intent in each instance." [Citations.]' " (*Ibid.*)

The 1990 events and the 2005 events were sufficiently similar to support an inference that defendant acted with the same intent on both occasions. In both instances, defendant encountered a young female stranger in her 20's at a downtown Palo Alto bar. On both occasions, defendant followed the woman and approached her when she was alone and vulnerable. In 1990, defendant followed N. home and returned on a subsequent night to catch her alone and asleep. In 2005, defendant spotted S. outside Fanny & Alexander's and later followed her into an alley where he found her alone and unconscious. Both offenses occurred in the early morning hours on a weekend. Indeed, both events occurred after 2:00 a.m. on a Sunday morning. The 1990 events and the 2005 events both culminated in defendant's isolating his victim on a bed in a bedroom. These distinct similarities strongly supported an inference that, as he had in 1990, defendant harbored the intent to rape when he singled

---

[9] Defendant also contends that Evidence Code section 1108 violates the due process clause of the United States Constitution, but he concedes that this court is bound by the California Supreme Court's decision rejecting this argument. Hence, we need not address this contention.

out S., followed her into the alley, put her in his car, and took her to a motel in Hayward. The trial court could properly conclude that the 1990 and 2005 events were sufficiently similar to justify the admission of evidence of the 1990 rape under Evidence Code section 1101, subdivision (b) to prove intent.

The next question is whether the trial court abused its discretion in failing to exclude evidence of the 1990 rape under Evidence Code section 352. "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) On appeal, "[t]his court reviews the admissibility of evidence of prior sex offenses under an abuse of discretion standard. [Citation.] A trial court abuses its discretion when its ruling 'falls outside the bounds of reason.' " (*People v. Wesson* (2006) 138 Cal.App.4th 959, 969 [41 Cal.Rptr.3d 883] (*Wesson*).)

█ In general, "the probative value of the evidence must be balanced against four factors: (1) the inflammatory nature of the uncharged conduct; (2) the possibility of confusion of issues; (3) remoteness in time of the uncharged offenses; and (4) the amount of time involved in introducing and refuting the evidence of uncharged offenses." (*People v. Branch* (2001) 91 Cal.App.4th 274, 282 [109 Cal.Rptr.2d 870].)

Defendant contends that the 1990 rape's probative value was substantially outweighed by the probability that the admission of this evidence would cause him undue prejudice.

Because defendant's intent was the primary contested issue at trial, evidence of his intent had substantial probative value. The defense at trial conceded that defendant had taken S. to the Hayward motel, but urged that he had acted without any nefarious intent. The significant similarities between the 1990 events and the 2005 events, as outlined above, established that the 1990 rape had a great deal of probative value on the intent issue. This strong probative value must be weighed against the potential for this evidence to cause undue prejudice to defendant.

The evaluation of the potential for prejudice must consider numerous factors, including "[the prior sex offense's] nature, relevance, and possible remoteness, the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other sex offenses, or

excluding irrelevant though inflammatory details surrounding the offense." (*People v. Falsetta* (1999) 21 Cal.4th 903, 917 [89 Cal.Rptr.2d 847, 986 P.2d 182].) Other relevant factors include whether the uncharged acts are more inflammatory than the charged conduct, the possibility the jury might confuse the uncharged acts with the charged acts and seek to punish the defendant for the uncharged acts, and the time required to present the evidence of the uncharged acts. (*People v. Harris* (1998) 60 Cal.App.4th 727, 738–739 [70 Cal.Rptr.2d 689]; *Wesson, supra,* 138 Cal.App.4th at p. 970.)

The 1990 rape was highly relevant, and the 1990 and 2005 events had significant similarities. Although the 1990 rape occurred 15 years before the 2005 events, it was not remote because defendant had been incarcerated for the vast majority of that period. Defendant had admitted committing the 1990 rape, so there was no uncertainty about its commission. This also meant that defendant bore no burden to defend against the 1990 rape, and the jury would not be distracted by having to decide whether the 1990 rape had occurred. There was no likelihood that the jury would confuse the 1990 and 2005 events, as they were quite distinct, and the fact that defendant had been convicted of the 1990 rape eliminated the possibility that the jury would seek to punish defendant for that offense. The completed 1990 rape was undoubtedly more inflammatory than the 2005 events, which were abruptly terminated by S.'s escape from the motel room. However, the trial court made substantial efforts to exclude the more inflammatory details regarding the 1990 events, which minimized any prejudice to defendant. The jury did not hear, among other things, about N. praying or defendant's threat to break a bottle over her head if she did not stop praying. The presentation of the evidence of the 1990 rape was not expected to, and did not, consume much time at trial, as all that was required was N.'s brief testimony and the introduction of a few documents.

"The prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence. '[A]ll evidence which tends to prove guilt is prejudicial or damaging to the defendant's case. The stronger the evidence, the more it is "prejudicial." The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying section 352, "prejudicial" is not synonymous with "damaging." ' " (*People v. Karis* (1988) 46 Cal.3d 612, 638 [250 Cal.Rptr. 659, 758 P.2d 1189].) Here, the damage to defendant's case from the admission of evidence of the 1990 rape was only that which naturally flowed from relevant, highly probative evidence.

In sum, the trial court did not abuse its discretion in admitting evidence of the 1990 rape, as the risk of undue prejudice from its admission did not substantially outweigh its substantial probative value.

## B. Exclusion of Defense Expert Testimony

Defendant maintains that the trial court prejudicially erred in excluding expert testimony offered by the defense.

### 1. Background

The prosecution requested an Evidence Code section 402 hearing on the admissibility of expert testimony by proposed defense expert David Breithaupt. The defense wished to have Breithaupt testify as an expert on alcoholic blackouts or as an expert on alcohol's effects on memory.

Breithaupt testified at the Evidence Code section 402 hearing that he was a former physician who had specialized in endocrinology, metabolic disorder, and "indicative disorder." He had relinquished his medical license in 2004. Breithaupt had worked in drug and alcoholism treatment. He had previously testified as an expert on alcoholism three times. Once, he had testified regarding the effect of alcoholism on the human body in a murder case. Breithaupt had never testified in court about alcoholic blackouts. He based his expertise on his personal experiences with addicts.

Breithaupt described what he called a "blackout" as a kind of alcohol intoxication-induced amnesia. This type of blackout was a symptom of alcoholism. Breithaupt defined this type of "amnesia" as "a permanent inability to recall events during a specific interval." Breithaupt testified that a person who had consumed a lot of alcohol and suffered a blackout could have a conversation during the blackout that the person would not remember afterwards due to his or her alcohol consumption. Breithaupt asserted that a "serious spree drinker with high tolerance will have blackouts." He maintained that a person who had a blackout might "fill in the gaps" in his or her memory "with confabulation."

Breithaupt was asked how he would diagnose blackouts. He responded: "Amnesic disorder could be diagnosed if a person is drinking; acknowledges loss of memory; thirdly, gives you evidence of lying or confabulating to cover a gap in time that you are aware of [from] some other source; it would be—you would obtain a past history of similar event, generally speaking. That's four; and five, some evidence that during the amnesic disorder, the person was, quote, able to function, end quote, function up to their standard."

Defendant's trial counsel argued that Breithaupt's proposed testimony was relevant because there was evidence that S. had blacked out, as she could not remember how she and her friends got from one bar to another and gave inconsistent testimony about the events. Defendant's trial counsel contended that it was important to educate the jury about the difference between "pass[ing] out" and having a "blackout." The prosecutor questioned Breithaupt's expertise regarding blackouts, and he maintained that alcohol's effect on memory was commonly understood and therefore was not a proper subject for expert testimony. The prosecutor also argued that such expert testimony would be relevant only if defendant was going to testify. Finally, he argued that Breithaupt's testimony should be barred under Evidence Code section 352 as speculative, confusing, and misleading. The prosecutor claimed that the admission of Breithaupt's testimony would be unduly time consuming because he would have to "call rebuttal witnesses and go into his qualifications and extensively cross-examine him." He asserted that this testimony would not be probative because S.'s recollections were inconsistent with her having been in an alcoholic blackout.

The court considered whether Breithaupt had the necessary qualifications to testify and whether his testimony would be relevant to the issues in the case. The court made a "tentative ruling" excluding Breithaupt's proposed testimony, but it noted that its ruling "could change, depending on what occurs during the trial . . . ." The court provided two reasons for its tentative ruling. First, the proposed testimony would be "speculative" as there was insufficient evidence that S. had actually suffered a blackout. Second, Breithaupt's testimony was "quite confusing" and would "mislead the jury and be an undue consumption of time."

Defendant's trial counsel renewed her request that Breithaupt be permitted to testify after the trial court ruled that the 1990 rape was admissible under Evidence Code sections 1108 and 1101, subdivision (b). The court did not rule on this request, and the defense did not seek a ruling.

S. testified at trial that "I actually don't remember how I got into the car." She also testified that there were times that night "where [she] was doing things and don't remember." "Like, for example, I'm pretty sure we walked to [Fanny & Alexander's] from Nola's, and I don't remember doing that." She agreed that "that block of time is missing." The following colloquy occurred on cross-examination: "Q. [by defendant's trial counsel] Did you know who you were talking to and who you were with at all times? [¶] A. No. [¶] Q. Do you remember where you were in the alley? [¶] A. Not really." However, S. testified unequivocally that she was "pretty much positive" that she had never spoken to defendant. She also denied that she had "nodded or pointed" in response to anything he said.

After the prosecution rested, defendant's trial counsel renewed her motion to admit Breithaupt's testimony "for that purpose of alcohol on memory and also for blackouts." The prosecutor argued that there was no basis for the admission of such evidence. "[T]here is no gap. There is no period of time that anybody has testified to where she's conscious, she's doing things, and she testifies that she doesn't remember." The court decided that there was no basis to change its ruling. After the defense had presented its case, defendant's trial counsel decided not to renew her request to admit Breithaupt's testimony.

In her argument to the jury, defendant's trial counsel suggested that "[t]here were some blocks of time [S.] didn't remember where she knew she was doing things." She argued that S. might have been "awake" "between being in the alley and getting in the car" but "has no memory of it." "So we don't know whether or not it's an alcoholic blackout type situation or whether or not she just really didn't remember because she had too much to drink."

### 2. Analysis

Defendant claims that the trial court abused its discretion in excluding Breithaupt's proposed expert testimony.[10]

"The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) " 'Exclusion of evidence as more prejudicial, confusing or distracting than probative, under Evidence Code section 352, is reviewed for abuse of discretion.' [Citation.] But 'exclusion of evidence that produces only speculative inferences is not an abuse of discretion.' " (*People v. Cornwell* (2005) 37 Cal.4th 50, 81 [33 Cal.Rptr.3d 1, 117 P.3d 622], disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22 [87 Cal.Rptr.3d 209, 198 P.3d 11].)

---

[10] He also claims that the trial court violated his constitutional rights by excluding this testimony. The Attorney General asserts that defendant waived his constitutional contention by failing to raise it below. Defendant concedes that he did not raise his constitutional contention below, but he nevertheless urges us to consider it. The cases he cites in support of his request that we consider this issue did not involve a claim that evidence was erroneously admitted or excluded. An appellate contention that the erroneous admission or exclusion of evidence violated a constitutional right is not preserved in the absence of an objection on that ground below. (Evid. Code, §§ 353, 354; *People v. Mattson* (1990) 50 Cal.3d 826, 853–854 [268 Cal.Rptr. 802, 789 P.2d 983].) By failing to object below, defendant forfeited his claim that the exclusion of this evidence violated his constitutional rights, and we will not consider this claim.

The trial court concluded that Breithaupt's testimony would have little probative value, since it was mere speculation that S. had suffered a blackout while in defendant's presence. It further found that Breithaupt's lengthy and "quite confusing" testimony was likely to mislead the jury.

The trial court's conclusion that the proposed testimony would have little probative value is well supported by the record. The defense's theory of relevance for Breithaupt's proposed testimony about alcoholic blackouts depended on two layers of speculation. The defense argued that it was *possible* that S. had agreed to accompany defendant in his car to the Hayward motel but did not remember doing so because she *might have been* experiencing an alcoholic blackout at that time. The evidentiary void consisted of the absence of evidence that S. was actually experiencing an alcoholic blackout when defendant encountered her in the alley and the absence of evidence that S. had agreed to accompany defendant.[11] S. did not testify that she was experiencing an alcoholic blackout at any point during her contact with defendant. While there was evidence that S. was highly intoxicated at the time defendant encountered her in the alley, she testified that she was not able to move or speak, except to vomit, and was drifting in and out of consciousness throughout the period when she was in defendant's presence. She testified unequivocally that she had neither said nor done anything to indicate that she agreed to accompany defendant. Defendant did not testify, and there was no evidence, other than S.'s testimony, regarding S.'s conduct or condition during her encounter with defendant.

The record also provides substantial support for the trial court's finding that Breithaupt's proposed testimony would be unduly time consuming, confusing, and misleading to the jury. Breithaupt's testimony at the Evidence Code section 402 hearing was quite time consuming, and it was evident that, had he been permitted to testify, the prosecutor would have been compelled to present more time-consuming expert testimony to rebut Breithaupt's testimony. The fact that even the trial court found Breithaupt's testimony "quite confusing" indicated that his testimony was unlikely to "assist the trier of fact." (Evid. Code, § 801, subd. (a) [expert opinion testimony limited to that which would assist the trier of fact].)

Our review of the record confirms the trial court's depiction of the confusing nature of Breithaupt's testimony. Breithaupt described alcoholic blackouts as a symptom of alcoholism, and he attempted to describe how he

---

[11] While the trial court made its tentative ruling prior to S.'s testimony, it subsequently affirmed its ruling after the completion of the prosecution's case, when defendant's trial counsel renewed her request for admission of Breithaupt's testimony. Consequently, it is appropriate for us to consider the trial testimony in analyzing the validity of the trial court's ruling.

would "diagnos[e]" an alcoholic blackout. He explained that a diagnosis of alcoholic blackout depended on the individual in question "acknowledg[ing] loss of memory" and the existence of "evidence that during the amnesic disorder, the person was, quote, able to function, end quote, function up to their standard." This testimony was confusing because it assumed that a person who had no memory of an event would know that they had no memory of that event and could acknowledge that loss of memory. That would be true only if there was other evidence that the event had occurred. Here, there was no evidence that S. had acknowledged a loss of memory during her encounter with defendant, no evidence that she had done anything to indicate that she was willing to accompany defendant, and no evidence that S. was "function[ing]" except to vomit during her encounter with defendant.

Defendant relies heavily on *Clark v. State* (Fla.Dist.Ct.App. 2007) 969 So.2d 573 (*Clark*), a decision by the Florida District Court of Appeal. Clark was charged with sexual battery on a person "physically helpless to resist," a phrase that was statutorily defined to mean " 'unconscious, asleep, or for any other reason physically unable to communicate unwillingness to an act.' " (*Clark*, at pp. 574–575.) It was undisputed that the victim had been intoxicated and that sexual activity had taken place between her and Clark. (*Clark*, at p. 574.) The sole disputed issue at trial was whether the victim had been "physically helpless to resist" at the time of the sexual activity. (*Ibid.*) The victim remembered nothing of the incident, and there was no evidence about the circumstances of the sexual activity. (*Ibid.*)

The defense sought to introduce expert testimony on several issues. First, the defense proposed to have its expert testify that the victim's level of intoxication was not sufficient to have rendered her unconscious. Second, based on the victim's deposition testimony and her testimony at Clark's first trial, the defense wished to have the expert testify that the victim was an alcoholic with a history of alcoholic blackouts during which she remained functional, and that she could have consented to the sexual activity without having any memory of it. Third, the defense sought to have its expert testify that, in his opinion, the victim was not physically helpless to resist during the sexual activity. (*Clark, supra*, 969 So.2d at p. 574.) The trial court permitted the expert to testify that the victim's intoxication would not have rendered her unconscious, but the remainder of his proposed testimony was excluded. (*Clark*, at pp. 574–575.) On appeal, the Florida District Court of Appeal found reversible error. It concluded that the trial court should have permitted the expert to testify that, in his opinion, the victim was physically able to resist, and, based on the victim's testimony, that the victim had a history of alcoholic blackouts during which she remained conscious. (*Clark*, at pp. 576–577.)

We do not agree with *Clark* or find it helpful on the issue before us. In *Clark*, there was apparently considerable evidence that the victim was an alcoholic with a history of alcoholic blackouts during which she was functional. Here, the defense did not proffer anything more than speculation that S. might have previously suffered an alcoholic blackout during which she was functional. In *Clark*, the victim had no memory of the sexual activity, and the central issue was whether she was conscious or unconscious at that time. Here, the central issue was not unconsciousness, but defendant's intent and whether S. consented or reasonably appeared to consent. S. testified that she did not consent, or give any physical or verbal indication that she assented, to accompany defendant in his car to Hayward. She did not lack all memory of the events, but instead testified about those portions of her encounter with defendant during which she was conscious.

Critically, *Clark*'s decision to reverse the judgment was largely premised on its startling conclusion that the defense expert should have been permitted to testify to the ultimate issue of whether the victim was physically able to resist. "Expert opinion is not admissible [in California] if it consists of inferences and conclusions which can be drawn as easily and intelligently by the trier of fact as by the witness." (*People v. Torres* (1995) 33 Cal.App.4th 37, 45 [39 Cal.Rptr.2d 103].) As there was evidence that the victim in *Clark* was an alcoholic with a history of functional blackouts and that she was intoxicated at the time of the sexual offenses, the expert's opinion that she was physically able to resist was a conclusion that could have been drawn as easily and intelligently by the jury. Here, of course, defendant did not proffer such expert opinion, which is not admissible in California. Since *Clark* is factually distinguishable and legally questionable, it does not provide a persuasive foundation for defendant's contention.

The trial court could rationally conclude that the extremely minimal probative value of Breithaupt's proposed testimony was substantially outweighed by the likelihood that it would be unduly time consuming and would confuse the jury. (Evid. Code, § 352.) Hence, it did not abuse its discretion in excluding Breithaupt's proposed testimony.

Furthermore, even if we were to conclude that the trial court erred in excluding Breithaupt's proposed testimony, we would conclude that the error was harmless. "No judgment shall be set aside, or new trial granted, in any cause, on the ground . . . of the improper admission or rejection of evidence . . . unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." (Cal. Const., art. VI, § 13.) As we have discussed above, Breithaupt's proposed testimony had minimal probative value. Any probative value that it had depended on the jury's rejecting S.'s

testimony that she was unable to move or speak when she was in the alley, and, despite the absence of any evidence, speculating that she had actually indicated to defendant, a stranger, that she wished to accompany him in his car in the middle of the night. Breithaupt's proposed testimony provided no rational basis for making such inferential leaps. The evidence presented to the jury in this case very strongly supported the prosecution's case. We are confident that no rational juror would have disregarded the prosecution's strong case and instead opted to make the speculative inferential leaps that would have been necessary to apply Breithaupt's confusing proposed testimony. On this record, it is not reasonably probable that the result of the trial would have been any different if Breithaupt had been permitted to give his proposed testimony. (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

## C. Kidnapping of an Incapacitated Person

Defendant contends that the trial court's kidnapping instruction permitted the jury to base its verdict on a legally invalid theory because the instruction "relax[ed]" the force requirement if the jury found that the victim was incapacitated.

### 1. Background

At the instruction conference, defendant's trial counsel objected to the modified version of CALCRIM No. 1201 that the prosecutor had asked the court to give. She objected to the language: "A person with a mental impairment includes an unconscious or intoxicated adult." The court suggested replacing "includes" with "may include." In the course of the discussion, the court asked: "There is no crime of kidnapping of intoxicated person?" Defendant's trial counsel responded: "No, there is not, but this [instruction] is making a crime." She noted that "there is no case out there that is published that says an intoxicated person is mentally impaired." The court decided to give the modified version of CALCRIM No. 1201 but replaced "includes" with "may include." The defense requested, and the court agreed to give, an instruction on defendant's reasonable good faith belief in consent.

The court gave the following instructions to the jury. "The defendant is charged in Count 1 with the crime of kidnapping a person with a mental impairment who was not capable of giving legal consent to the movement for purpose of rape. To prove the defendant is guilty of this crime, the People must prove that: One, the defendant intended to commit rape; two, acting with that intent, the defendant used enough physical force to take and carry away an unresisting person with a mental impairment; three, acting with that

intent, the defendant moved the person with a mental impairment a substantial distance; four, the person was moved or made to move a distance beyond that merely incidental to the commission of a rape; five, the person suffered from a mental impairment that made her incapable of giving legal consent to the movement; and six, the defendant did not actually and reasonably believe that the other person consented to the movement. [¶] A person with a mental impairment may include unconscious or intoxicated adults incapable of giving legal consent. The person is incapable of giving legal consent if he or she is unable to understand the act, its nature, and possible consequences."

"The defendant is not guilty of kidnapping if he reasonably and actually believed that the other person consented to the movement. The People have the burden of proving beyond a reasonable doubt that the defendant did not reasonably and actually believe that the other person consented to the movement." "When one consents to accompany another, there is no kidnapping, so long as the condition of consent exists. To consent, a person must: One, act freely and voluntarily and not under the influence of threats, force, or duress; two, have knowledge she was being physically moved; and three, possess sufficient mental capacity to make an intelligent choice whether to be physically moved by the other person. [¶] Being passive does not amount to consent. Consent requires a free will and positive cooperation in act or attitude."

The prosecutor argued: "This is not a kidnapping case of an average person. This is a kidnapping of a woman who is so intoxicated, at times unconscious, she couldn't resist. She was impaired. She could not give legal consent." "Regarding mental impairment, you are instructed that that includes a person who is intoxicated from alcohol or unconscious from alcohol if that person's incapable of giving legal consent. I'm not saying—and this instruction doesn't say that if you think the person had a drink, that a person who had one drink is mentally impaired and therefore, that beats [sic] that definition. No. [¶] You have to ask yourselves, how drunk was she? What was her state of consciousness? Clearly, a person who is unconscious is incapable of giving legal consent. Person who is semi-conscious is not capable of giving legal consent. They don't have the mental capacity to make an intelligent choice if they are so out of it; same with the person who had 13 shots who is throwing up in the alley who basically could hear but can't move and can't talk. [¶] Was she capable? She couldn't answer her phone. She couldn't talk. She couldn't move. She was throwing up. She was passing in and out. Legally, she could not consent to being moved."

Defendant's trial counsel conceded that S. was "drunk," but she argued that S. was not "mentally impaired" because she was able to recall most of the events and able to reason during them. "I'm arguing that S[.] did not have

a mental impairment; that she was drunk. That's not what a mental impairment is." "[Y]ou never heard from one expert called by the prosecution to say, yeah, someone is intoxicated, they are mentally impaired; they are mentally impaired to the extent that they are incapable of giving legal consent." "[W]e didn't have any medical testimony as to whether or not S[.] was mentally impaired that night."

She argued that, because S. was able to vomit out the window of the car, S. was not unable to move, as S. claimed. Defendant's trial counsel suggested that S. had willingly gotten into defendant's car. She argued that defendant had not intended to rape S. but had instead been "hopeful to get some consensual sex." "[I]t wasn't just a good samaritan situation." Defendant hoped "they could connect as a woman and a man." Defendant's trial counsel also argued that "there is absolutely no evidence that any force was used on her at all" to get her into the car. "In fact, the logical inference is what she told the officer, that she got into the car." "It's not up to the defense to prove that she got into the car, but it's up to the prosecutor to prove, number one, that she was impaired and unable to give consent; and number two, that there was enough physical force used on her to take and carry an unresisting person."

The prosecutor's closing argument addressed the force issue. "The use of force by this man. If he put his hand on her at all on the way to the car, that's an application of physical force. You may say, well, that won't be that much force, but it's enough to an unresisting person who is wasted, totally intoxicated, out of her mind. That's enough force." Defendant's trial counsel did not object to this argument. The prosecutor also argued: "If she was incapable of giving legal consent [due to her intoxication] . . . then yes, that's a mental impairment for purposes of kidnapping."

## 2. Analysis

Defendant contends that there is no legal authority to support the "relax[ation]" of the force requirement for kidnapping where the victim is unconscious or otherwise incapacitated.[12]

"Any person who kidnaps or carries away any individual to commit . . . rape . . . shall be punished by imprisonment in the state prison for life with the possibility of parole." (Pen. Code, § 209, subd. (b)(1).) "Every person who forcibly, or by any other means of instilling fear, steals or takes, or holds, detains, or arrests any person in this state, and carries the person into

---

[12] We will use the term "incapacitated" as it is the broader term and obviously includes unconscious victims.

another country, state, or county, or into another part of the same county, is guilty of kidnapping." (Pen. Code, § 207, subd. (a).)

 Penal Code section 209's use of the words "kidnaps or carries away" has long been interpreted to incorporate Penal Code section 207's definition of simple kidnapping as elements of an aggravated kidnapping, as described by Penal Code section 209. (See *People v. Daniels* (1969) 71 Cal.2d 1119, 1131 [80 Cal.Rptr. 897, 459 P.2d 225].) "As the language [of Penal Code section 207] indicates, the statute generally requires that the defendant use force or fear. [Citations.] 'If a person's free will was not overborne by the use of force or the threat of force, there was no kidnapping.' " (*People v. Hill* (2000) 23 Cal.4th 853, 856 [98 Cal.Rptr.2d 254, 3 P.3d 898], fn. omitted (*Hill*).)

Although Penal Code section 207 contains an explicit force or fear requirement that admits of no exceptions, the California Supreme Court has long viewed as a special situation those cases where the kidnapping victim was a small child. The seminal case is *People v. Oliver* (1961) 55 Cal.2d 761 [12 Cal.Rptr. 865, 361 P.2d 593] (*Oliver*). Verga Oliver, who was drunk, led a two-year-old boy by the hand down an alley. The boy apparently went willingly with Oliver. Oliver and the boy first sat behind a fence, and Oliver talked to the boy as Oliver drank more liquor. A short time later, Oliver and the boy were found undressed from the waist down with Oliver engaged in lewd conduct with the boy. (*Oliver*, at p. 763.) Oliver was charged with lewd conduct and kidnapping. The jury was instructed: " 'To constitute the crime of kidnaping . . . there must be a carrying, or otherwise forcible moving, for some distance of the person who, against his will, is stolen or taken into the custody or control of another person. . . .' " (*Oliver*, at p. 764.) The jury was also instructed that kidnapping was a general intent crime. (*Ibid.*) Oliver was convicted of both counts.

Oliver contended before the California Supreme Court that, due to the fact that kidnapping was a general intent offense and a child was incapable of giving legal consent, a person could be convicted of kidnapping for " 'merely escort[ing] a small child from point A to point B without a wrongful or any purpose.' " (*Oliver, supra*, 55 Cal.2d at pp. 764–765.) The California Supreme Court found merit to this contention. It reasoned that the Legislature did not intend to include within the crime of kidnapping the movement of a child, with or without the child's resistance, in the absence of a "malign or evil purpose." (*Oliver*, at p. 765.) On the other hand, the court stated that the Legislature did intend to include the very same movement within the crime of kidnapping where the perpetrator harbored "an evil and unlawful intent." (*Ibid.*)

The court went on: "Similar instances as readily suggest themselves in which the intent with which an adult person, who by reason of extreme intoxication, delirium or unconsciousness from injury or illness is unable to give his consent, is forcibly carried by another, should determine whether such forcible carrying is or is not kidnaping within the legislative purpose. If I forcibly carry a helplessly intoxicated man lying in the middle of the highway to a place of greater safety, if I forcibly take a delirious man or one who is unconscious to a hospital or to a doctor, nobody again could reasonably believe that it was the intention of the Legislature that for any of these acts I could be convicted of kidnaping. But if I forcibly take one of such persons and carry him in the same manner for an evil and unlawful purpose, everybody would again agree that my conviction of kidnaping would fall within the legislative design. [¶] The rule governing the forcible carrying of conscious persons capable of giving consent, which makes a person who forcibly carries such a person and transports him against his will guilty of kidnaping, however good or innocent his motive or intent may otherwise be, can only lead to obvious injustice and a perversion of the legislative purpose if blindly and literally applied where the person who is forcibly transported, because of infancy or mental condition, is incapable of giving his consent." (*Oliver, supra*, 55 Cal.2d at pp. 765–766.)

The court concluded that Penal Code section 207's description of the crime of kidnapping had to be narrowed to conform to the Legislature's intent. "Penal Code, section 207, as applied to a person forcibly taking and carrying away another, who by reason of immaturity or mental condition is unable to give his legal consent thereto, should . . . be construed as making the one so acting guilty of kidnaping *only if* the taking and carrying away is done for an illegal purpose or with an illegal intent. So construed the legislative purpose will be preserved and furthered, and innocent persons who cannot have been within the legislative intention in adopting section 207 will be excluded from the operation of the law." (*Oliver, supra*, 55 Cal.2d at p. 768, italics added.) The court concluded that the general intent instruction was prejudicially erroneous because a jury could have reasonably concluded that Oliver formed his lewd intent after he had transported the boy behind the fence. It reversed the kidnapping count. (*Oliver*, at p. 768.)

While *Oliver* itself said nothing about relaxing the *force* requirement where the kidnap victim was a child, two subsequent Court of Appeal cases attributed such an interpretation to *Oliver*.[13] In *Parnell v. Superior Court*

[13] A third Court of Appeal case chose a slightly different characterization of *Oliver*. In *People v. Duran* (2001) 88 Cal.App.4th 1371 [106 Cal.Rptr.2d 812] (*Duran*), Duran had clearly used force against the baby, as he had pointed a gun at the baby's head. (*Duran*, at p. 1379.) The Court of Appeal characterized *Oliver* as having "created an exception to the 'free will' element in cases where the victim of the kidnapping is a young child. In those cases, the

(1981) 119 Cal.App.3d 392 [173 Cal.Rptr. 906] (*Parnell*), the Court of Appeal found that there was "ample force to satisfy the 'forcible taking' element of section 207." (*Parnell*, at p. 402.) However, in a footnote, the court stated that, in "dicta in *Oliver*," "our Supreme Court has implied that the kidnaping of a minor can be accomplished even if unaccompanied by force so long as it was done for an improper purpose, because a minor 'is too young to give his legal consent to being taken . . . .' " (*Parnell*, at p. 402, fn. 3.) In *People v. Rios* (1986) 177 Cal.App.3d 445 [222 Cal.Rptr. 913] (*Rios*), which was not a kidnapping case, the Court of Appeal characterized *Oliver* as having "indicated that in kidnapping cases the requirement of force may be relaxed where the victim is a minor who is 'too young to give his legal consent to being taken' and the kidnapping was done for an improper purpose."[14] (*Rios*, at p. 451.)

In the wake of *Rios* and *Parnell*, the California Supreme Court decided *Hill*. The court concluded that there was "ample evidence of force or fear" in *Hill* because the defendants had forced the woman and her child to accompany them in the car, and had driven the car with both the woman and the child inside of it. (*Hill, supra*, 23 Cal.4th at p. 857.) "Here, defendant snatched the baby as well [as] the mother. The baby certainly did not move herself. Dabney also threatened to shoot the baby, thus using her as leverage to force the mother's cooperation. Additionally, the car seat was unbuckled, and Marissa [the baby] was rolling around on the front seat while defendant drove. We are unaware of any authority that to suffer kidnapping, a baby must apprehend any force used against her." (*Hill*, at pp. 857–858.) Because the force or fear requirement was satisfied in *Hill*, it was not necessary for the court to decide whether *Oliver* had eliminated the force or fear requirement where the victim " 'by reason of immaturity or mental condition is unable to give his legal consent' " to the movement. (*Hill*, at p. 857.) "We need not, and do not, decide whether, or to what extent, the *Oliver* decision eliminated the need to show as to a child force or fear in addition to an illegal purpose, or whether the illegal purpose itself establishes force or fear [citation], for here ample evidence of force or fear exists." (*Ibid.*) Nevertheless, the court suggested in *Hill* that *Oliver* had "relaxed" the force requirement. "At the least, our decision in *Oliver* 'indicated that in kidnapping cases the requirement of force may be relaxed where the victim is a minor who is "too young to give his legal consent to being taken" and the kidnapping was done for an improper purpose.' " (*Ibid.*)

---

prosecution need only establish that the taking and carrying away was done for an illegal purpose or with an illegal intent." (*Duran*, at p. 1378.)

[14] As the California Supreme Court would subsequently note, "[n]either *Parnell* nor *Rios* explained precisely where in *Oliver* we suggested that the force requirement should be eliminated or relaxed where the victim is an infant or small child." (*In re Michele D.* (2002) 29 Cal.4th 600, 609 [128 Cal.Rptr.2d 92, 59 P.3d 164] (*Michele*).)

The California Supreme Court followed up *Hill* with *Michele*. Michele was pushing her friend's one-year-old daughter around in a stroller as the two girls shopped. The two girls became separated in the store, and the friend then found the stroller abandoned in an aisle. Michele had taken the infant out of the stroller and absconded with her. Michele and the infant were found about a mile and a half away. (*Michele, supra*, 29 Cal.4th at pp. 603–604.) Michele was found to have committed kidnapping. (*Michele*, at p. 605.)

On review, Michele contended that Penal Code section 207's force requirement "means a forcible seizure and this, in turn, requires something more than the mere quantum of physical force necessary to effect movement." (*Michele, supra*, 29 Cal.4th at p. 605.) The California Supreme Court rejected her claim that she had not committed kidnapping within the meaning of Penal Code section 207. "Even if force, as conventionally understood, was not used to effect [the infant's] kidnapping, [Michele's] intent in carrying off the infant still renders her conduct kidnapping." (*Michele*, at p. 606.) "The fact that the Legislature may not have considered every factual permutation of kidnapping, including the carrying off of an unresisting infant, does not mean the Legislature did not intend for the statute to reach that conduct." (*Ibid.*) After discussing *Oliver* and its holding that the court could find Penal Code section 207 inapplicable even where its literal language applied based on legislative intent, the California Supreme Court decided that it could equally well find that Penal Code section 207 *was* applicable even where its literal language *was not* satisfied if the legislative intent supported such an interpretation.

"The difference is that, whereas in *Oliver* we were concerned that a literal construction of the statute might lead to wrongful convictions, in this case a literal construction of the statute might result in the absurd consequence of finding that a kidnapping did not occur where it is clear a kidnapping was intended." (*Michele, supra*, 29 Cal.4th at pp. 607–608.) "If, as we observed in *Oliver*, the child victim went 'willingly' with defendant, the implication is that force was not used against him. Thus, our holding in *Oliver*—that, where the victim by reason of youth or mental incapacity can neither give nor withhold consent, kidnapping is established by proof that the victim was taken for an improper purpose or improper intent—was reasonably extended in *Parnell* and *Rios* to encompass situations in which, because of the victim's youth, there is no evidence the victim's will was overcome by force."[15] (*Michele*, at p. 609.) The court held that "the amount of force required to kidnap an unresisting infant or child is simply the amount of physical force required to take and carry the child away a substantial distance for an illegal purpose or with an illegal intent." (*Michele*, at p. 610.)

---

[15] As noted earlier, neither *Parnell* nor *Rios* actually extended *Oliver*, as their interpretations of *Oliver* were in dicta. The court in *Parnell* found substantial evidence of force, and *Rios* was not a kidnapping case.

The California Supreme Court rejected Michele's claim that its holding would eliminate a question of fact that was committed to the fact finder. *"Oliver* expressly modified the consent requirement in such cases, and implied that a relaxation of the force requirement might also be necessary to effectuate the purpose of the statute. We do no more than that. Our duty is to construe the statute in a manner that avoids the absurd consequence of allowing a defendant who carries off an infant or small child under circumstances similar to those in the present case to escape liability. The trier of fact will still have to make the ultimate determination based on the totality of the evidence whether a kidnapping has been proved beyond a reasonable doubt." (*Michele, supra,* 29 Cal.4th at p. 613.) The court did limit the scope of its holding. "We note that our decision here affects only a narrow class of cases in which an unresisting infant or small child is taken away without any force or fear. In the typical kidnapping case, the prosecutor must prove that there was force or fear, and does not need to show an illegal purpose or intent." (*Michele,* at p. 612, fn. 5.)

Two subsequent Court of Appeal cases have followed *Michele.* (*People v. Jones* (2003) 108 Cal.App.4th 455, 462 [133 Cal.Rptr.2d 358] [kidnapping of infant falls within *Michele*'s holding]; *People v. Dalerio* (2006) 144 Cal.App.4th 775, 782 [50 Cal.Rptr.3d 724] [nine-year-old kidnapping victim falls within *Michele*'s holding].) No published case has extended *Michele*'s holding to an incapacitated adult.

Defendant contends that we cannot extend *Michele*'s holding to an incapacitated adult. He argues: "[C]ourts are not free to engage in policy-based, ad hoc expansions of statutory provisions. The only way that the kidnapping statute can be extended to reach the substantial movement of voluntarily unconscious or intoxicated individuals is through a determination by a court that the Legislature intended to proscribe such conduct in Penal Code section 209." Defendant maintains that the Legislature did not so intend.[16]

Defendant's argument implicitly concedes that Penal Code section 209, subdivision (b)(1) may be extended to cover the taking and asportation of an incapacitated person if *a court* determines that the Legislature intended the statute to proscribe such conduct. Indeed, the California Supreme Court extended Penal Code section 207 in *Michele* to cover the taking and asportation of an infant because it concluded that the Legislature had intended for the statute to proscribe such conduct. "Our duty is to construe

---

[16] Defendant also asserts, "[f]or purposes of preserving a federal due process claim," that Penal Code section 209 does not provide "fair warning" that the kidnapping of an incapacitated person for an illegal purpose is prohibited. As he does not develop this contention, we decline to address it. (*People v. Cain* (1995) 10 Cal.4th 1, 42–43, fn. 17 [40 Cal.Rptr.2d 481, 892 P.2d 1224].)

the statute in a manner that avoids the absurd consequence of allowing a defendant who carries off an infant or small child under circumstances similar to those in the present case to escape liability." (*Michele, supra*, 29 Cal.4th at p. 613.) An interpretation of Penal Code section 209, subdivision (b)(1) to avoid the absurd consequence of allowing a defendant to escape liability for carrying off an incapacitated person for the purpose of rape serves the legislative purpose underlying the statute, just as the California Supreme Court's construction of Penal Code section 207 did in *Michele*.

■ Indeed, under the rationale of *Michele*, it is our "duty" to construe Penal Code section 209, subdivision (b)(1) to proscribe the kidnapping for rape of an incapacitated person, as to find otherwise would be absurd. Our construction of Penal Code section 209, subdivision (b)(1) relaxes but does not eliminate the force requirement. "[O]rdinarily the force element in section 207 requires *something more* than the quantum of physical force necessary to effect movement of the victim from one location to another." (*Michele, supra*, 29 Cal.4th at p. 606, italics added.) Since an incapacitated person, like an infant, has no ability to resist being taken and carried away, the "something more" that is "ordinarily" required is not necessary, and "the amount of force required to kidnap an [incapacitated person] is simply the amount of physical force required to take and carry the [incapacitated person] away . . . with an illegal intent." (*Michele*, at p. 610.) When a perpetrator uses the force necessary to take and carry away an incapacitated person to commit rape, the perpetrator uses the amount of force required by Penal Code section 209, subdivision (b)(1).

Defendant attempts to combat this construction of Penal Code section 209, subdivision (b)(1) by relying on *People v. Kelley* (1990) 220 Cal.App.3d 1358 [269 Cal.Rptr. 900] (*Kelley*). In *Kelley*, the Court of Appeal held that there was no force, and thus there could be no *robbery*, where property was taken from an unconscious victim and the victim's unconsciousness had not been caused by the defendant. (*Kelley*, at pp. 1368–1369.) The court in *Kelley* noted that "a theft from an unconscious or sleeping person 'does not pose the increased threat of actual or potential harm to the theft victim which the robbery statute was designed to discourage.' " (*Kelley*, at p. 1369.)

Because the taking and asportation of an incapacitated person poses a risk of harm to the victim that is similar to the risk of harm posed by the taking and asportation of a person who is not incapacitated, defendant's reliance on *Kelley* is misplaced. In *Hill*, a carjacking case in which one of the victims was a baby, the defendant also attempted to rely on *Kelley*. The California Supreme Court rejected the defendant's attempt to apply *Kelley* in that context because "[t]he analogy between robbery and carjacking is imperfect." (*Hill, supra*, 23 Cal.4th at p. 860.) "[T]he Legislature has made carjacking

more nearly a crime against the person than a crime against property. Moreover, unlike a robbery, a carjacking subjects an unconscious possessor or occupant of a vehicle to a risk of harm greater than that involved in an ordinary theft from an unconscious individual." (*Id.* at pp. 860–861.) So too here. The analogy between robbery and kidnapping is even more imperfect than the analogy between robbery and carjacking. Kidnapping is exclusively a crime against a person, and the taking and asportation subjects an incapacitated victim to a risk of harm similar to the risk of harm posed to a victim who is not incapacitated. Consequently, it cannot be said that a kidnapping of an incapacitated person to commit rape falls outside of the statutory purpose of Penal Code section 209, subdivision (b)(1).

Defendant makes two additional related contentions. He contends that the court's kidnapping instruction was improper because there was insufficient evidence that S. "was mentally impaired to the extent that she was incapable of giving consent to being forcibly transported." We find ample evidence in the record to support the instruction. S. testified that, at the point in time when defendant made contact with her in the alley, she was lying facedown, slipping in and out of consciousness, and unable to move or talk. She had no recollection of how she came to be in defendant's car. A rational jury could have readily concluded that S. was incapacitated and that her state of off-and-on unconsciousness coupled with her inability to move or talk was indicative of a mental impairment that precluded her giving consent at the time that defendant placed her in his car and drove away with her.

Defendant also challenges the sufficiency of the evidence to support his conviction on the ground that there was insufficient evidence to show that S. was "mentally impaired" when she was taken and carried away by defendant. The jury was instructed that an intoxicated person could be a person with a mental impairment, and there was substantial evidence that S. was incapacitated and mentally impaired when defendant placed her in his car and drove away with her. We therefore reject defendant's challenge to the sufficiency of the evidence.

■ We hold that Penal Code section 209, subdivision (b)(1) is violated when a defendant takes and carries away an incapacitated person to commit rape even if the defendant uses only the force necessary to accomplish such a taking and carrying away.

### D. Court Security Fee

Defendant argues, and the Attorney General concedes, that the court security fee must be reduced to $20 from $40 because he was convicted of only a single count. We agree and will order the judgment modified in this respect.

## IV. Disposition

The judgment is modified to reduce the court security fee to $20 from $40. The trial court is directed to prepare an amended abstract of judgment reflecting this modification and to forward a certified copy of the amended abstract to the Department of Corrections and Rehabilitation. As modified, the judgment is affirmed.

Elia, J., concurred.

**RUSHING, P. J.,** Dissenting.—I respectfully dissent.

### INTRODUCTION

It goes without saying that a gentleman does not take advantage of a lady who has had too much to drink. He who does so is no gentleman, and is deservedly held up to general contempt. But if the lady accedes to his advances, or appears to do so, he is not guilty of rape, and if he persuades her to accompany him in the hope that she will accede, he is not guilty of kidnapping for rape.

Defendant has been sentenced to spend the rest of his life in prison on evidence that could quite reasonably be taken to show no more than that he prevailed upon a young woman, who had had too much to drink, to accompany him, presumably with the objective—in his mind anyway—of sexual intercourse. I would not quarrel with this result if a properly instructed jury had found on substantial evidence, after a fair trial, that the young lady was a veritable patient etherized upon a table, or at least in such a stupor as to be manifestly only semiconscious. But the evidence here was heavily compromised by the fact that the only evidence of such a condition came from the young woman herself. No one else testified about what happened between the time she left her friends about 2:00 a.m. and the time she fled a Hayward motel room less than an hour later. Defendant's conviction necessarily stands or falls on her account. But that account consisted largely of her *inability to say* what had taken place between herself and defendant. It was undisputed that she had been drinking so heavily that she could at best report sporadic and fleeting memories of those critical minutes.

Ordinarily a key witness's inability to recall important events would be viewed as a serious liability to the proponent of her testimony. Here, however, the prosecutor made a strength of weakness by inviting the jury to assume that one who drinks as much as the alleged complainant had, and who later reports only flashes of memory, *must have been intoxicated to the point of unconsciousness*, or near-unconsciousness, when those events occurred.

The entire prosecution case was built upon this proposition, because the kidnapping charge presupposed that the complainant had been *incapable of moving*, or consenting to be moved, when defendant drove her to Hayward.

To rebut the prosecution's central inference, the defense sought to show, through expert testimony, that people who drink the way the complainant had been drinking may be remarkably awake, active, and competent at the peak of intoxication, but yet experience a particular form of *amnesia* erasing some or all memory of events, including their own conduct. Moreover, the expert would have testified, persons experiencing such amnesia may "fill in" gaps in their memory with confabulation, i.e., fictive memories.

I cannot escape the conclusion that in the context of this case, the proffered testimony possessed enormous probative value. It went straight to the heart of the prosecution case by casting serious doubt not only on the accuracy of the testimony given by the sole witness to the alleged crime, but also on the central *inference* on which the prosecution case rested. I see no sound basis for excluding such critical evidence. That ruling may well have determined the jury's verdict. Because defendant was entitled to present any competent evidence tending to raise a reasonable doubt about his guilt, I would reverse the judgment. I am therefore obliged, with the utmost respect, to dissent.[1]

---

[1] I must also distance myself from the majority's conclusion that defendant waived his federal constitutional objections by failing to raise them in the trial court. (Maj. opn., *ante*, at p. 320, fn. 10.) The gist of this charge of error is that the trial court's ruling so fundamentally and unjustifiably crippled the defense as to deny defendant's federal constitutional right to a fair trial. The primary if not only reason for raising this issue here is to preserve it for possible assertion in another forum. Defendant has raised it seasonably by asserting it in this court. The majority opinion's statement to the contrary is unnecessary to the present decision since the majority finds neither error nor prejudice. Its declaration of a procedural forfeiture can have no effect unless it is to cut off defendant's right to seek relief in another tribunal. I see no reason for such a declaration, and I would therefore not subscribe to it even if I agreed with the majority's analysis on the other issues discussed.

Moreover I must disagree with the majority's conclusion on the merits of this issue. The rule on which it rests does not appear in any of the authorities cited. Only one of them is concerned with the erroneous *exclusion* of evidence, and it only requires that the proponent "ma[k]e known to the court" the "substance, purpose, and relevance" of the proffered evidence. (Evid. Code, § 354, subd. (a), italics added.) The other cited authorities are concerned with error in the *admission* of evidence. (Evid. Code, § 353 [requiring predicate objection for appellate challenge]; *People v. Mattson* (1990) 50 Cal.3d 826, 853–854 [268 Cal.Rptr. 802, 789 P.2d 983] [applying requirement of predicate objection to federal exclusionary rules].) Some decisions in automatic appeals suggest that a defendant will not be heard to argue, for the first time on appeal, that the exclusion of evidence *in compliance with state law* violated a federal constitutional mandate. (*People v. Gordon* (1990) 50 Cal.3d 1223, 1264–1265 [270 Cal.Rptr. 451, 792 P.2d 251], citing *Lorenzana v. Superior Court* (1973) 9 Cal.3d 626, 640 [108 Cal.Rptr. 585, 511 P.2d 33]; *People v. Smithey* (1999) 20 Cal.4th 936, 995 [86 Cal.Rptr.2d 243, 978 P.2d 1171]).) It is somewhat difficult to square these holdings with the mandate of Evidence Code section 354, subdivision (a), but whatever their soundness in context, I would not extend them to cases where the evidence is excluded, as I conclude it was here, *in violation of state law*.

## I. *Probative Value*

Probative value refers to the tendency of evidence to prove or disprove an element of the crime, or a defense. Under the instructions given here, the elements of the crime of which the jury found defendant guilty were: "One, the defendant intended to commit rape; two, acting with that intent, the defendant used enough *physical force to take and carry away* an unresisting person with a mental impairment; three, acting with that intent, the defendant moved the person with a mental impairment a substantial distance; four, the person was moved or made to move a distance beyond that merely incidental to the commission of a rape; five, the person suffered from a mental impairment that made her *incapable of giving legal consent* to the movement; and six, the defendant did not actually and reasonably believe that *the other person consented* to the movement." (Italics added.)

Several of these elements depended on the hypothesis that the complainant was intoxicated to the point of *stupor*. The prosecutor's only argument to the jury in support of the element of force was that alcohol had rendered the complainant so torpid, indeed *inert*, that she was *incapable* of entering defendant's car under her own power.[2] This argument is quite revealing because it amounts to an implicit concession that the *only way* jurors could rationally infer the requisite application of force—even the gentle touching the prosecutor assured them was enough—was to believe that the complainant was *physically incapable* of entering the car on her own. A state of intoxication close to stupefaction was also indispensable to the elements that the complainant was "unconscious or . . . incapable of giving legal consent," and that defendant "did not actually and reasonably believe that the [complainant] consented to the movement."

These elements, it must be emphasized, are quite distinct from the "intent to rape" element and from any subsidiary factors—such as reasonable belief

---

[2] "The use of force by this man. If he put his hand on her at all on the way to the car, that's an application of physical force. You may say, well, that won't be that much force, but it's enough to an unresisting person who is *wasted, totally intoxicated, out of her mind.* That's enough force. [¶] Ask yourself this. Why would he have to drive the car over to where she is in the alley if she could get up and walk on her own to his car? Why would he have to drive the car over? Why? Number one, *she couldn't move. He had to put her in the car.* Number two, if he was carrying her across the whole parking lot, he would be more likely to be caught before he got there." (Italics added.)

"She just knows that she ended up in his car. She testified that she didn't remember how she got to the car. She does remember that *she didn't walk.* She doesn't remember walking. She told you what she was like in the alley and in the car; *unable to move.*" (Italics added.)

Similarly, in settling jury instructions the prosecutor argued, "The only reasonable inference to be drawn from all of the evidence we have heard is that she was moved by the defendant to his car. Whether he put her over his shoulder, whether he assisted her by carrying her one arm around his shoulders, whether he picked her up like a baby, or whether he dragged her, okay, she got to the alley then that was it."

in consent *to sexual intercourse*—that might bear on that element. The charge here was kidnapping—a movement of the complainant by force and without consent. If a kidnapping was not proven, defendant's ultimate intentions were academic. And a kidnapping was *not* proven if the jury *entertained a reasonable doubt* on *any one* of the following three propositions: (1) Defendant used force to accomplish the movement of the complainant; (2) the complainant was unconscious or incapable of giving consent to the movement; or (3) defendant did not reasonably believe the complainant consented to the movement.

The prosecution's proof of each of those propositions depended on interpreting the complainant's intermittent memories to mean that she was, in respondent's words, "passing in and out of consciousness." This premise also tended to shield the prosecution case from challenge by rendering the complainant's selective recollections invulnerable to conventional cross-examination. Thus even as she was professing to have been "out of it" for the entire time in question, she also testified that she was "pretty much positive" she had not spoken to defendant, that she had not nodded or pointed in response to anything he said, and did not agree to get into his car.

Dr. Breithaupt would have supplied a competing explanation for these intermittent memories. According to him, acute alcohol intoxication can cause a "spree" drinker with a high tolerance to lose, or never to store, memories of events in which she might have been an active participant. The loss of memory may be total (*"en bloc"*) or intermittent ("fragmentary" or "fragmented"). Further, in cases of fragmentary amnesia the subject may "fill in the gaps" in her memory with "confabulation," i.e., *false memories* of what happened. This means that an acutely intoxicated person might (1) fail to recall events in which she actively and consciously took part, and (2) replace the missing memory with false recollections of things that did *not* occur.

Obviously such testimony would have dropped a big fly in the prosecutorial ointment. By educating the jury about alcohol-based amnesia, it could cast an entirely different light on the complainant's patchwork recollections of the night in question. It could raise a reasonable doubt about the assumptions on which the entire prosecution case depended. I therefore cannot join the majority in concluding that the testimony possessed "extremely minimal probative value." On the contrary, it could raise a very serious doubt about the prosecution's central hypothesis, and very possibly mean the difference between conviction and acquittal.

II. *Speculativeness*

I see no sound basis for the trial court's characterization of the testimony as "speculative." The court approached the question as if the defense were

required to affirmatively prove that the complainant had actually experienced alcohol-induced amnesia. The defense had no such burden. The appropriate question was whether the jury could reasonably infer that the complainant *might* have suffered alcohol-induced amnesia, and that the possibility was substantial enough to raise a reasonable doubt about defendant's guilt. The evidence before the jury was more than sufficient to this purpose. A juror educated in the phenomenon of alcohol-induced amnesia would have acted quite reasonably in concluding that the complainant's intermittent memories were just as likely to be products of fragmentary amnesia as they were to be the products of, and evidence for, the all-important prosecution hypothesis that she was "passing in and out of consciousness." The same reasonable juror could conclude that her incriminating affirmative recollections—that she did not walk to the car, that she did not consent to accompany defendant— were just as likely to be the products of confabulation as of fortuitous (for the prosecution) returns to consciousness.

Dr. Breithaupt's testimony was conceptually identical to evidence that a certain drug, at certain dosage levels, tends to produce *hallucinations* in a certain class of users. If the sole prosecution witness to key facts is shown to belong to that class of users, and to have absorbed the required dosage of that drug at the time of the events related by him, evidence of his susceptibility to hallucinations under those conditions would go directly to his "capacity to perceive [and] to recollect . . . any matter about which he testifies." (Evid. Code, § 780, subd. (c).) Hence it would be directly relevant to "the truthfulness of his testimony," a subject on which the jury is entitled to consider "any matter" that has a reasonable bearing. (*Id.*, § 780.) To be sure, such evidence might be excluded as speculative if the *probability* of hallucinations were so slight that it could not support a *reasonable* doubt about the truthfulness of the testimony. But that can hardly be said here where the witness's own testimony lent affirmative support to the defense hypothesis. Thus the complainant testified, "I'm pretty sure we walked [between bars], and I don't remember doing that." She also did not remember where she was lying in the alley when supposedly found by defendant, though she presumably walked to that location. In light of Dr. Breithaupt's testimony, walking somewhere and having no memory of it could furnish a textbook case of alcohol-induced amnesia. Indeed, the complainant all but directly testified that she experienced such amnesia, stating that at times she "[was] doing things" that she "[didn't] remember." Dr. Breithaupt's testimony would have highlighted the importance of this testimony and its potential significance in evaluating the rest of the complainant's account.

I repeat, however, that defendant was under no burden to prove that the complainant actually experienced amnesia with respect to the period in question. He was entitled, in the absence of a sound basis for exclusion, to present any evidence that tended to raise a *reasonable doubt* about his guilt

by putting in question the verisimilitude of the complainant's account of events or the soundness of the inferences the prosecution drew from that account. Dr. Breithaupt's testimony had both effects. It was not speculative.

## III. *Lay Familiarity with Subject*

It is suggested that the effects of alcohol on memory are well known and therefore not a proper subject of expert testimony. The concept of an alcohol-induced "blackout" is not wholly unfamiliar, at least in cultures where heavy drinking is a reasonably familiar practice. Late night comedy is rife with jokes about waking up next to someone the storyteller has no recollection of meeting. But vague folk awareness is no substitute for competent expert testimony about a recognized medical phenomenon. Further, the proffered testimony went beyond or diverged from lay conceptions in at least three potentially critical respects. One was that blackouts are more common in "serious spree drinker[s] with high tolerance." A jury could certainly find that this description applied to the complainant here. Another was the medical recognition of fragmentary as distinct from *en bloc* amnesia—a distinction that could help to explain the complainant's professed ability to remember events sporadically. The third was that persons subject to blackouts, at least of the fragmentary type, may fill in the amnesic gaps with confabulated memories. All of these points bore directly on the issues raised by the prosecution, and defendant was entitled to present them for the jury's consideration in assessing those issues.

## IV. *Confusion*

### A. *"Blackout"*

My colleagues also conclude that the trial court could properly find the evidence so "confusing and misleading" as to justify its complete exclusion. (Maj. opn., *ante*, at p. 319.) The trial court initially identified this as its "only concern," i.e., that Dr. Breithaupt had "confused me quite often when he was testifying." Despite a certain loquacity and tendency to stray from the question asked—tendencies the trial judge had ample power to constrain, had he chosen to exercise it—I find nothing difficult to comprehend in the doctor's direct testimony.[3] Nor, given its critical role in the defense case, do I find the question debatable enough that the trial court could exclude it as an exercise of sound discretion.

---

[3] And we were forced to contend, as the trial court was not, with pervasive mistranscriptions, most notably of Dr. Breithaupt's repeated references to *en bloc* amnesia, which is never transcribed correctly, but appears variously as "on block," "unblock," and perhaps most entertainingly, "embolic."

The only subject of confusion to which the trial court specifically alluded was the witness's "terminology or how he was making reference to the blackout and amnesia." Unfortunately the court did not explain further. Certainly there is nothing confusing in the doctor's use of "amnesia," which was the term—hardly an unfamiliar one—he used to describe the central point in his testimony, i.e., that alcohol can sometimes interfere with the storage of perceptions and experiences during a period of intoxication, so that the drinker is thereafter unable to recall any memory, or can recall only fragmented memories, of what happened. To say that such a person has suffered an alcohol-induced amnesia is not the least bit confusing.

I will acknowledge that the lay term "blackout" carries some potential for perplexity, but not because of anything the witness said about it. Dr. Breithaupt described "blackout" as the term used "by the drinker and general public" to refer to the amnesia he was describing. He also acknowledged that it refers to "the period of time where someone is acting normally but can't remember it later." These statements appear entirely accurate and intelligible, as far as they go. But they point to a temporal conundrum, and a resulting potential for *linguistically based* confusion, that inheres in the common usage of the term. The amnesic condition with which we are concerned originates at the time of intoxication, but is only experienced some time later—unless the gaps are filled with confabulated memories, in which case it may not be experienced at all, subjectively speaking. In ordinary usage, "blackout" makes no distinction among these quite distinct aspects of the amnesic event. It may refer to the intoxicated period ("I was having a blackout"), to the malfunctioning storage of memory ("I must have blacked that out"), or to the later experienced gap in memory ("Last night is a total blackout"). The most natural of these usages—the first—is also the least accurate. The drinker is not "having" a blackout at the time of intoxication. Rather, the process inducing amnesia occurs, insensibly to him, as his perceptions fail to register in long-term memory. He only *knows* he has had a blackout—if indeed he ever does—when he attempts to retrieve memories of the time he was intoxicated and finds none available.

There is thus an intrinsic paradox or ambiguity in any attempt to fix a "blackout" at a particular point in time. But I see no point during his *direct* testimony at the 402 hearing (Evid. Code, § 402), where these intrinsic perplexities caused any difficulty. They were, however, exploited by the prosecutor, who, apart from questioning Dr. Breithaupt's qualifications as an expert, used his cross-examination largely to sow confusion based on just such perplexities. One example was a series of questions concerning the distinction between "fragmentary" and *en bloc* amnesia. He professed to understand the witness to say that "[In] [t]he fragmentary blackout, a person is still able to function and talk and walk and react to things and access their memory; correct? It's just that they might then leave that fragmentary

blackout, go into a phase where they will later remember that; in other words they are going in and out of a fragmentary blackout, but all the while, in the fragmentary blackout, they are able to function; correct?" This is indeed a deeply confusing question, but the confusion is entirely of the questioner's making. Dr. Breithaupt never hinted that the distinction between the two forms had anything to do with the subject's mental state or conduct *at the time of intoxication.* With respect to the fragmentary type, at least, he specifically said that the subject "will not be consciously aware of it." Rather the distinction concerned the nature of the subject's *memories* of that time upon any later attempt to recall it. He described *en bloc* as "a total period of amnesia for a certain interval," whereas fragmentary is "in and out a little bit." The prosecutor's attempt to cast this as going in and out of a "blackout" represents an adroit exploitation of the very linguistic difficulty I have just noted. The remedy there was to direct the prosecutor to ask an intelligible question, not to bar the witness from testifying. If a cross-examiner could render expert testimony inadmissible by eliciting confusing answers with confusing questions, I do not see how such testimony would ever make it into any trial. An expert witness does not have to qualify as a champion debater before he may give testimony that assists the trier of fact.

### B. *Diagnosing Blackouts; Acknowledged Loss of Memory*

My colleagues find potential for confusion in testimony they describe as addressing "how [Dr. Breithaupt] would 'diagnos[e]' an alcoholic blackout." (Maj. opn., *ante*, at p. 322.) Testimony on that subject would indeed seem inherently confusing, not only for the reasons I just mentioned, but also because "blackout" is not a medical term, and the construction is thus akin to "diagnosing" a hallucinogenic "trip," a marijuana "high," or a caffeine "buzz." But the doctor never used any such construction. The cited testimony was elicited by the prosecutor on cross-examination, and only after relentlessly pressing Dr. Breithaupt to say how he would "diagnose" what the prosecutor interchangeably referred to as "alcohol blackout or amnesic disorder with an emphasis on alcohol." The prosecutor used a form of the word "diagnose" or "diagnosis" at least four times before he could get Dr. Breithaupt to adopt it. Even then Dr. Breithaupt only used it to declare a particular criterion "*not* diagnostic." (Italics added.) When he finally succumbed to the prosecutor's usage, he did so not in the context of "blackouts" but rather, quite properly and rationally, "[a]mnesic disorder." The prosecutor was the only person in court attempting to equate the two terms, or entertaining the conceit that one could "diagnose" a "blackout."

Nor did Dr. Breithaupt ever say that such a diagnosis "depended on the individual in question 'acknowledg[ing] loss of memory.' " (Maj. opn., *ante*, at p. 322.) In the quoted paragraph he listed five *factors* that a practitioner

would weigh in determining whether a subject had experienced alcohol-induced amnesia. Shortly before, he had stated quite clearly that while an acknowledged absence of memory "helps you with your impression," it is "not diagnostic."

## V. Consumption of Time

Nor can I concur in the conclusion that the exclusion of the testimony was justified because, if it had been allowed, "the prosecutor would have been compelled to present more time-consuming expert testimony to rebut Breithaupt[] . . . ." (Maj. opn., *ante*, at p. 321.) I see no basis to suppose that the prosecutor would have been able to find a witness to "rebut" Dr. Breithaupt's testimony. Assuming he could, the burden of rebutting solidly probative evidence is not grounds for its exclusion.

## VI. Clark v. State

It is true that the witness in *Clark v. State* (Fla.Dist.Ct.App. 2007) 969 So.2d 573, had a known history of blackouts, which would of course enhance the probative value of expert testimony like that at issue here. For reasons I have already expressed, however, I do not believe such evidence is necessary. The question is not whether evidence positively *proves* that a witness's testimony is unreliable, but whether it has "any tendency in reason" to so establish. Testimony about the effects of alcoholic amnesia is relevant whenever there is a reasonable basis in the evidence to believe that the conditions for amnesia were present, i.e., a period of acute intoxication, particularly in a spree drinker with a high tolerance, and gaps (or demonstrable inaccuracies) in the witness's memory of that period. These conditions need not be conclusively shown, though here they were not seriously disputed. The evidence need only be substantial enough to raise a reasonable doubt about the reliability of the witness's account of events—or the prosecution's explanation for her inability to give an account.

Nor do I believe *Clark* is distinguishable on the ground that "the central issue" here was "not unconsciousness, but defendant's intent and whether [the complainant] consented or reasonably appeared to consent." (Maj. opn., *ante*, at p. 323.) As I have said, the whole prosecution case turned on the premise that the complainant was stuporous, and thus manifestly *incapable* of consenting, and indeed of *moving*. This is essentially the same issue presented in *Clark*, and the expert testimony had the same bearing on it.

Nor do I see any relevant difference between Florida and California law. I find nothing "startling" in the fact that Florida permits expert witnesses to opine upon the "ultimate issue" in a case. That is the modern trend, which

California joined in 1967, when the Evidence Code took effect. (Evid. Code, § 805 ["Testimony in the form of an opinion that is otherwise admissible is not objectionable because it embraces the ultimate issue to be decided by the trier of fact."].) What I find surprising is the lingering judicial resistance to this legislative mandate more than four decades after its adoption.

Nor is there any room here for the premise that Dr. Breithaupt's testimony " 'consists of inferences and conclusions which can be drawn as easily and intelligently by the trier of fact as by the witness.' " (Maj. opn., *ante*, at p. 323, quoting *People v. Torres* (1995) 33 Cal.App.4th 37, 45 [39 Cal.Rptr.2d 103].) Breithaupt's testimony did not purport to draw inferences or conclusions; rather it would have educated jurors on a subject, as to which he was an expert and they were not, that was highly relevant to the issues they had to decide.

## VII. *Prejudice*

Given the foregoing view of the case, I cannot join in my colleagues' conclusion that the exclusion of Dr. Breithaupt's testimony was harmless. Far from possessing "minimal probative value" (maj. opn., *ante*, at p. 323), his testimony could well have made the difference in the jurors' determination whether the complainant's account was sufficiently reliable to sustain a guilty verdict.

This was not an easy or straightforward case. The jury deliberated for a day. That fact alone should preclude any suggestion that the outcome would not have been affected by evidence casting doubt on the whole of the complainant's testimony. At best the conviction rests on equivocal and highly inferential evidence, i.e., that the complainant was "out of it" but remembered just enough to know that she did not consent to anything. Indeed her testimony even on that point conflicted with her early statement to police, whom she told that she might have gotten into the car with defendant under her own power because he said he would take her to her friends. The complainant obviously had a very strong motive to deny that she willingly accompanied a complete stranger in circumstances that her friends and family would surely think made her conduct extraordinarily reckless at best. There is little question that she was either too drunk to know what she was doing, or too drunk to remember what she had done. Dr. Breithaupt's testimony, in light of the other evidence, could very well have persuaded jurors that the latter possibility was at least as likely as the former, or at any rate likely enough to leave a reasonable doubt about the accuracy of her version of events.

The complainant's testimony was vulnerable on a number of other points. I have already alluded to the fact that no one—neither her barhopping companions, nor the Samaritans who drove her home from the motel—could corroborate her testimony that she was "out of it," intermittently or otherwise. Much was made at trial of her testimony that she was vomiting throughout the period in question. However, the only corroboration for this testimony was the presence of her DNA on the passenger door of defendant's car. This may indeed have been the most incriminating evidence in the entire case—or would have been, had the case been fairly tried. But a properly educated jury would have known that someone who drank as much as the complainant had drunk might well pass from a state of active but blacked-out consciousness to a state of stupor at any time. Thus, assuming her vomiting out the window tended to reflect a stuporous state—a supposition for which there appears to be no distinct evidentiary basis—it was still compatible with an inference that she *entered the car* during a blacked-out state rather than a stuporous one. And on the prosecution theory as argued to the jury, that possibility, if substantial enough to raise a reasonable doubt, required an acquittal.

The complainant's attempts to portray herself as nauseated (and by implication, stuporous or protostuporous) at earlier points in the evening were uncorroborated at best, and compromised at worst. Thus she testified that she first threw up when she and her companions visited one of the bars' restrooms. But neither of them saw this happen. She was apparently not vomiting *after* her encounter with defendant, while riding away from the motel with her two benefactors. Apart from the DNA evidence, there is apparently no independent evidence of vomiting until the next day, when she was observed to visit the restroom for that purpose at the police station.[4]

The complainant also testified that the recollection of her abductor touching her breast first came to her as a "flashback" at the police station the next day; she "didn't remember it at first" but only "remembered it after." The two men who gave her a ride described her making statements that she herself had no recollection of making, including that she had been kidnapped when she went outside to talk on her phone, a statement that conflicts with at least two other accounts she gave. A jury exposed to Breithaupt's testimony could find these fragmentary and shifting memories consistent with the hypothesis that blacked-out gaps in her memory were being filled in after the fact with confabulated details. It seems plain to me that exposure of the jurors to that testimony would have been reasonably likely to produce a verdict more favorable to defendant.

---

[4] A jury already questioning the complainant's account might well wonder why, if her condition were as bad as she described, no evidence was presented that she had vomited on her clothes.

## Conclusion

The only real question in this case was whether the complainant was too drunk to *do* anything, or too drunk to *remember* what she did. The prosecution was permitted to present a picture in which she was too drunk to do anything most of the time, but not so drunk that she could not accurately report damning recollections on particular highly incriminating points. The defense was entitled to present expert testimony that would cast serious doubt on both of these propositions. The exclusion of that testimony was an abuse of discretion. It cannot be dismissed as harmless. I believe it requires reversal of the judgment. I therefore respectfully dissent.

A petition for a rehearing was denied September 1, 2009, and appellant's petition for review by the Supreme Court was denied November 10, 2009, S176210. Kennard, J., Werdegar, J., and Corrigan, J., were of the opinion that the petition should be granted.