Filed 1/21/15  Thomas v. Fire Ins. Exchange CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| ANTHONY G. THOMAS et al., | H037948 |
| Plaintiffs and Appellants, | (Santa Clara County Super. Ct. No. CV116710) |
| v. | |
| FIRE INSURANCE EXCHANGE et al., | |
| Defendants and Respondents. | |

Plaintiffs Anthony G. Thomas and Wendi Thomas (the Thomases) sued their homeowner's insurer, defendant Fire Insurance Exchange (FIE), and their insurance broker/agent, defendant Edwin Higashi, for negligence, negligent misrepresentation, and conversion after their home and its contents were destroyed by fire.  FIE had paid the Thomases the full policy limits under their homeowner's insurance policy (the policy) for the dwelling and the full policy limits under the policy for the contents of the dwelling.  The Thomases claimed that Higashi had assured them that their policy would cover more than $20 million in loose emeralds and other collectibles stored in their home even though the policy's contents limit was $207,750.  The Thomases also claimed that FIE had negligently failed to secure the property after the fire and had taken some of the Thomases' property from the debris.  The action was tried to a jury, and the jury returned a defense verdict.

On appeal, the Thomases make two claims of prejudicial error. They challenge the trial court's exclusion of evidence that the Thomases' dwelling had been undervalued by FIE for insurance purposes and the trial court's response to a jury question during deliberations about FIE's liability for actions taken by the salvage company that FIE hired to sift through some of the debris from the fire. We conclude that the court did not prejudicially err and affirm the judgment.

## I. Factual Background

The Thomases obtained a homeowner's insurance policy from FIE through Higashi for their Morgan Hill residence. The policy limit for the dwelling was $277,000, and the limit for personal property was $207,750. A "personal article floater endorsement," for which the Thomases paid an additional annual premium of about $650, provided $45,935 in coverage for several specific items of jewelry. The jewelry endorsement was the result of the Thomases obtaining supplemental coverage each time they acquired another item of jewelry. An appraisal was required for each jewelry item, and the premium increased for each item. Another of the policy's endorsements provided coverage of $200 per card and $1,000 "in the aggregate" for "sports cards."

The Thomases had a large collection of sports "memorabilia" that they stored in their garage. This collection included hockey cards, baseball cards, and football cards that Anthony Thomas (Anthony) valued at $50,000 or $60,000. Anthony testified that he also had a collection of around 8,000 "cut and polished" emeralds weighing nearly 13 pounds, most of which he stored under a piece of plywood in his attic. Although he testified that he had acquired these emeralds for just under $300,000 (most of it in cash),

2

he claimed that the emeralds were worth $25 million.[1] Anthony stored about 100 of his emeralds in a gun safe and a few in his bedroom. He testified that he stored most of his emeralds in his attic because he wanted to ensure that even if someone stole his gun safe the thief would not get most of his emeralds. Anthony also had two emerald statutes.[2]

The Thomases' home was destroyed by fire on August 13, 2006 while they were on vacation. The Thomases immediately made a claim under their policy. By the day after the fire, the remains of the Thomases' dwelling had been bulldozed at the direction of firefighters due to safety concerns. A neighbor retrieved the Thomases' gun safe from the debris, and it was returned to Anthony.[3] The day after the fire, a fire investigator visited the scene and saw nothing "salvageable." Kristena Wilk, FIE's claims adjuster, was assigned to the claim the day after the fire. When she inspected the site on August 16, she found piles of debris scattered around portions of the two-acre lot where the Thomases' dwelling had been. She saw nothing salvageable or of value in the debris.

FIE hired ServiceMaster, a restoration company, to do some sifting of the debris on the property to see if any items could be recovered. The sifting occurred on August 29, 2006. A few items were found, and ServiceMaster took custody of some of these items to store for the Thomases to later retrieve. FIE ultimately paid the Thomases

---

[1] Anthony testified at trial that he believed that the emeralds stored in his attic had increased in value to $30 million since he had acquired them. His expert testified that the emeralds, including the ones in the gun safe that survived the fire but were damaged, were worth about $14 million. He had seen only photos of the emeralds that were not in the gun safe. The Thomases' attorney asked the jury to award the Thomases $14 million for the emeralds.

[2] Anthony testified that he paid $6,000 for the two statues. The Thomases' expert testified that the statues were worth $4,000 to $5,000 each.

[3] Anthony later showed FIE's adjuster the contents of the gun safe, which included emeralds and some guns. Some of these emeralds and guns had been damaged in the fire.

the $207,750 contents policy limits and $37,435 for the two of the three items of jewelry covered by the floater endorsement that had been lost in the fire.[4]

## II.  Procedural Background

The Thomases filed an action against FIE and Higashi.  Four of the causes of action in their second amended complaint were presented to the jury.[5]  One of these causes of action was for negligence against Higashi and FIE and alleged that Higashi and FIE were negligent because they had a duty to provide the Thomases with "full replacement cost insurance coverage," represented that they had done so, but had failed to do so.  A negligent misrepresentation cause of action against Higashi and FIE alleged that Higashi had affirmatively assured the Thomases that their emeralds, worth more than $20 million, "were already covered for their full replacement value under the terms of the Policy" and did not require "additional coverage."  Higashi had also allegedly assured the Thomases that their other personal property was "insured for full replacement cost under the Policy and that their insurance coverage was adequate regardless of the specified limits."

A negligence cause of action against only FIE alleged that, after the fire, FIE undertook a duty not to damage or destroy any property left in the debris.  FIE then "arranged for and retained an entity known as ServiceMaster as their agent to, among other things, investigate and scavenge the Property to recover, and to the extent possible, restore [the Thomases'] Personal Property."  The Thomases did not allege that ServiceMaster had been negligent.  Instead, the Thomases alleged that FIE had been

---

[4]     The third item of jewelry was not in the home at the time of the fire.

[5]     The court granted defense motions for nonsuit on all of the Thomases' causes of action other than negligence, negligent misrepresentation, and conversion.  The Thomases do not challenge these rulings on appeal.

4

negligent in preventing the Thomases from searching the debris, assuring the Thomases that FIE would carefully search the debris, rejecting ServiceMaster's proposal for a more extensive sifting of the debris, and allowing the items found by ServiceMaster in the debris (parts of the statues, some papers, and a few hockey cards) to be damaged or lost.

The conversion cause of action alleged that (1) FIE wrongfully exercised "dominion and control" over the Thomases' property after the fire by refusing to allow the Thomases to search through the debris for their personal property, (2) FIE took possession of some of the Thomases' personal property "by directing [FIE's] agent ServiceMaster to remove and retain certain items" of the Thomases' personal property recovered from the debris, and (3) FIE "took and removed" some of the Thomases' personal property from the debris and "thereafter lost or destroyed such property." The only mention of ServiceMaster in the conversion cause of action was the allegation that FIE "direct[ed] [its] agent ServiceMaster to remove and retain certain items of Personal Property located and recovered from the Property after the Fire."

At trial, the Thomases sought to recover damages for the loss of "their memorabilia, their trading cards, their guns, their emeralds, and their statues." FIE did not deny that the Thomases had some such items in their home at the time of the fire, but it did dispute the Thomases' claim that they had $25 million in emeralds in their attic. The court found as a matter of law and instructed the jury that the policy's contents limit was $207,750 and that FIE had paid this amount to the Thomases.

The jury returned a special verdict.[6] It rejected the negligence cause of action against both Higashi and FIE by finding that Higashi had not been negligent in "failing to obtain a policy" for the Thomases that provided "unlimited coverage for their personal property" or in failing to "accurately disclose the terms and conditions of the policy."

---

[6] The special verdict form was agreed upon by all parties.

5

The jury rejected the negligent misrepresentation cause of action by finding that Higashi had not represented to the Thomases that their policy provided "unlimited coverage for their personal property" and had not "otherwise misrepresent[ed] the terms and conditions of the policy." The jury's verdict was nine to three on both of these causes of action.

The jury also rejected the negligence cause of action against only FIE. It found that FIE *had been* "negligent in conducting a recovery effort at the loss site" but that FIE's negligence *was not* "a substantial cause of harm or damage" to the Thomases. The jury divided nine to three on the first question and 10 to two on the second question. The jury unanimously rejected the conversion cause of action. It found that the Thomases had "emeralds, financial papers and trading cards in their home at the time of the fire," but FIE had not "intentionally take[n] possession of the emeralds, financial papers and trading cards following the fire and refuse[d] to return the emeralds, financial papers and trading cards after [the Thomases] demanded their return." The court entered judgment on the jury's verdict. The Thomases timely filed a notice of appeal from the judgment.

### III. Discussion

### A. Exclusion of "Undervalued Homes" Evidence

### 1. Background

### a. In Limine Motions

Both Higashi and FIE moved in limine to exclude evidence concerning the adequacy of the policy's dwelling limits. The Thomases' claims concerning the policy's coverage for the dwelling had been settled. The settlement agreement included a release under which the Thomases released FIE and Higashi "from any legal theory that argues that the limits for anything other than the Coverage C - Personal Property portion of the claim are or should be different than on the declarations page . . . except the Coverage C

6

Personal Property portion of the claim and all causes of action pertaining to the Coverage C Personal property claim . . . ."

FIE sought exclusion of any evidence regarding the policy's coverage limit for the dwelling including "allegations of under-insurance of the dwelling." FIE's motion identified as its targets an " 'undervalued homes report' " and certain potential testimony by Anthony's brother. The "Undervalued Homes Report" was single-page list of about 50 FIE "insureds [including the Thomases] who had purchased their policies from defendant Higashi [and] who were possibly underinsured." Higashi had been questioned at his deposition about this report. In a recorded statement, Higashi had stated that he believed that he had accurately valued the Thomases' property using FIE's computerized system based on the information available to him at that time. Anthony's brother had testified at his deposition that, after the fire, he increased his policy limits on an FIE homeowner's policy he obtained through Higashi because "he felt he was underinsured." FIE contended that this evidence should be excluded as irrelevant under Evidence Code section 350 and as more prejudicial than probative, confusing, and unduly time consuming under Evidence Code section 352.

Higashi sought exclusion of evidence of "the sufficiency or insufficiency of the policy limits for coverage provided for the structure of the Plaintiffs' home, including but not limited to evidence of the 'Undervalued Homes' list." He noted that "[t]he only possible relevance" of this evidence "would be based on the fact that contents limits are initially set as a percentage of the structure limits." Higashi argued that this "list" was irrelevant to the Thomases' claim and that it improperly delved into the issue of the dwelling claim, which the parties had settled. Higashi asserted that the introduction of such evidence would be unduly time consuming and "prejudice the jury . . . by suggesting that he was negligent in some way in preparing the policy, and hoping that this will slop over into their [*sic*] opinion of him as to the Coverage C issue."

7

The Thomases filed a very brief written opposition to Higashi's motion but no written opposition to FIE's motion. Their written opposition to Higashi's motion did not focus on the specific evidence identified by Higashi and FIE in their motions. Instead, the Thomases argued that "evidence of the discussions of the insured and agent relative to limits in the policy are relevant to the issues in this case including corroboration, fraud, intent, contract, reliance, justifiable reliance, common scheme motive or design." They claimed in their opposition that evidence concerning the dwelling limits was admissible because, "if Mr. Higashi had done his job . . . , at least the insured would be entitled to substantially more [contents coverage] than they had received thus far." At the hearing on the motions, the Thomases asserted that the undervaluation of their home was relevant simply because the personal property limit was calculated as a percentage of the home's value.

The court granted the motions and excluded evidence concerning the dwelling coverage limits and the "underinsurance issue regarding the coverage of the dwelling."

### b. Evidence At Trial

Anthony testified at trial that Higashi never told him that there was "a limit" on his insurance. He testified that Higashi told him that, "in the event of a loss of any of the memorabilia," "I would get full replacement cost at the time of the loss for everything that I had" with no "cap" on his recovery. He claimed that he had shown to Higashi an appraisal stating that the emeralds were worth $25 million, and Higashi had told him that "he could insure the cut and polished emeralds" although the insurance, unlike that provided by the jewelry floater endorsement, would not cover theft. Anthony testified that, right after the fire, FIE told him he was "covered for $270,000" for his dwelling, and he said: "[H]ow could that be? My house was a million two."

Higashi testified at trial that Anthony told him in 2001 that he had acquired some emeralds. Higashi asked Anthony if he wanted to "purchase coverage" for the emeralds. Anthony said no because he kept the emeralds in his "gun safe." At that time, the

8

Thomases lived in a rented home, and their policy limit for personal property was $100,000. After the Thomases purchased a home, their personal property limit increased to $207,750. The Thomases never asked Higashi to increase their contents coverage.

An insurance expert testified at trial that the FIE contents coverage limit "is automatically 75 percent of" the dwelling coverage limit. Another insurance expert testified that the premium for a policy covering $25 million in jewelry would be about $300,000 per year. He explained that an insurance agent will generally be motivated to sell more coverage because the agent gets a portion of the premium. The only reason an agent would have for "underinsuring property" would be "to present a more attractive price to the insurance buyer."

### 2. Analysis

The Thomases contend that the trial court should not have excluded evidence that "tended to show that Higashi and FIE undervalued the Thomases' home for purposes of calculating the [dwelling coverage limit]." They claim that such evidence "could have established" that Higashi and FIE breached their duty of care in valuing the dwelling, "which caused" the contents limit to be "substantially lower" than it would have been if the dwelling had "been properly valued."

Higashi and FIE sought exclusion of this evidence under both Evidence Code section 350 and 352. The trial court's ruling did not specify the statutory basis for the exclusion. The Thomases assume that the court did not "base its ruling" on Evidence Code section 352 because the court did not expressly state that it had weighed the probative value of the evidence against any prejudice. They essentially claim that the court failed to exercise its discretion, and its ruling therefore cannot be upheld under Evidence Code section 352.

A trial court applies Evidence Code section 352 by weighing the probative value of the evidence against the potential for undue prejudice from its admission. (*People v. Daniels* (2009) 176 Cal.App.4th 304, 316.) "[A]lthough the record must affirmatively

9

show that the trial court weighed prejudice against probative value . . . , the trial judge 'need not expressly weigh prejudice against probative value—or even expressly state that he has done so [citation.].' [Citations.] Thus, as the cases reflect, we are willing to infer an implicit weighing by the trial court on the basis of record indications well short of an express statement." (*People v. Padilla* (1995) 11 Cal.4th 891, 924, overruled on a different point in *People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1.) Such "record indications" include "argument of counsel or comments by the trial court, or both, touching on the issues of prejudice and probative value from which we might infer that the court was aware of the Evidence Code section 352 issue and thus of its duty to weigh probative value against prejudice." (*Padilla*, at p. 924.)

Higashi's written motion explicitly argued that the court should exclude this evidence under Evidence Code section 352 because the admission of this evidence would result in undue consumption of time and would "prejudice the jury . . . ." Similarly, FIE's written motion sought exclusion of this evidence under Evidence Code section 352 on the ground that it was more prejudicial than probative, confusing, and unduly time consuming. At the hearing on its motion, FIE argued that introduction of this evidence would confuse the jury. The court responded: "I don't want to get into the dwelling coverage. That was subject to a good faith settlement."

These "record indications" are sufficient to show that the trial court based its ruling on Evidence Code section 352 and engaged in the requisite weighing. The written and oral arguments of the parties focused the court's attention on the prejudice, confusion, and time consumption that they claimed would result from the admission of this evidence. The court's response that it "d[id]n't want to get into" the issues raised by this evidence also indicated that it accepted FIE's claim that this evidence would confuse the jury and be unduly time consuming. Had the court merely concluded that the evidence was irrelevant, it would not have used language reflective of a choice in

10

denying FIE's motion. We find that the court exercised its discretion in excluding this evidence.

The Thomases also contend that the court abused its discretion in excluding this evidence. "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) On appeal, we review the court's Evidence Code section 352 ruling for abuse of discretion. "A trial court abuses its discretion when its ruling 'falls outside the bounds of reason.'" (*People v. Wesson* (2006) 138 Cal.App.4th 959, 969.)

The evidence that the trial court excluded had very little, if any, probative value on the issues alleged by the Thomases in their operative complaint on the causes of action that went to the jury. The Thomases alleged that Higashi and FIE were liable for negligence because they had a duty to provide the Thomases with "full replacement cost insurance coverage," represented that they had done so, but had failed to do so. They alleged that Higashi and FIE were liable for negligent misrepresentation because Higashi had affirmatively assured the Thomases that their emeralds, worth more than $20 million, "were already covered for their full replacement value under the terms of the Policy" and did not require "additional coverage," that their other personal property was "insured for full replacement cost under the policy[,] and that their insurance coverage was adequate regardless of the specified limits."

The evidence that was excluded did not concern any of the issues raised in the Thomases' complaint that went to the jury. Evidence that FIE and/or Higashi had undervalued the dwelling in setting the dwelling coverage had no tendency to show that either of them had represented that the Thomases had "full" and adequate contents coverage and did not need additional contents coverage. Indeed, the theory that the Thomases claim that this evidence would have been probative on was never alleged in

11

their complaint. Even assuming that this evidence had some modicum of probative value on the issues that were actually before the jury in the Thomases' action, the trial court could reasonably conclude that the presentation of such evidence would be unduly time consuming and confusing to the jury. The determination of whether the Thomases' dwelling was actually undervalued would have necessitated the presentation of a great deal of evidence on an issue that did not directly address any of the Thomases' allegations. And, as the defense pointed out, it would confuse the jury because no questions concerning the policy's dwelling coverage were before it. We find no abuse of discretion in the trial court's discretionary decision to exclude this evidence.

## B. Response to Jury Question

During deliberations, the jury asked the trial court if FIE was liable for subcontractors such as ServiceMaster. After consulting with the attorneys, the trial court told the jury that the answer was no. The Thomases contend that this response was prejudicial error because FIE could have been found vicariously liable for ServiceMaster's negligence.

### 1. Background

The Thomases did not allege in their operative complaint that ServiceMaster had been negligent or had converted any of the Thomases' property. Their negligence cause of action against only FIE alleged that FIE had been negligent in preventing the Thomases from searching the debris, assuring the Thomases that FIE would carefully search the debris, rejecting ServiceMaster's proposal for a more extensive sifting of the debris, and allowing the items found by ServiceMaster in the debris to be damaged or lost. Their conversion cause of action alleged that FIE took possession of some of the Thomases' personal property "by directing [FIE's] agent ServiceMaster to remove and retain certain items of Personal Property located and recovered from the Property after the Fire."

12

FIE noted in its opening statement that ServiceMaster had told FIE, after a day of sifting through the rubble, that the sifting was "not going to be productive." FIE also told the jury in its opening statement that some of the items found in the rubble had "seemingly not [been] saved" and "had seemingly [been] discarded" by ServiceMaster. "[FIE] can't explain why. They don't know why."

Wilk testified at trial that she told the Thomases that FIE was going to hire ServiceMaster to sift through the debris "for things that could document or support their claim." ServiceMaster's role was to "do sifting of the property" and "retain a few items to help document" the Thomases' claim. Wilk asked the Thomases if there was anything specific that they wanted to be looked for, and they identified "a few items," including emeralds, that they wanted sought. Wilk could not remember whether she specifically asked ServiceMaster to look for "cut and polished" emeralds and an "emerald bear statue."

Wilk testified: "I asked [ServiceMaster] what they could do as far as sifting through the property. And they provided an estimate and some ideas for me. And so that's what basically went on their recommendation of what could be done, what they thought would be the right method. And we kind of went from there." ServiceMaster estimated it would cost $20,000 to $40,000 (on a time and materials basis) to sift through all of the debris. Wilk and ServiceMaster agreed that ServiceMaster would start by doing one day of sifting through some of the debris piles "to see what we could find and go from there."

Wilk was present and observed most of the sifting on August 29, 2006. She did not see either of the Thomases on the property during the sifting. ServiceMaster "picked several places as a representative sampling of the property to see what could be found." Wilk took photos of every item that ServiceMaster removed from the property to be stored for the Thomases to retrieve. These items were a "bear statue," a "large stone," another statue, which was large and in pieces, "some financial papers," including a

13

passport, part of an insurance policy, and an "instruction manual," some "unsalvageable" photographs, and a few "hockey trading cards." Wilk testified that "[i]t was our agreement that [ServiceMaster] would store [these items], not destroy them." Only the bear statue and the stone appeared to potentially have any significant value. No "cut and polished" emeralds were found. After "several hours," ServiceMaster suggested that the sifting be discontinued because it "wasn't coming up with anything." Wilk agreed that they should stop sifting. This one day of sifting cost FIE less than $3,000. FIE did not do anything to secure the property or to prevent people on the property from removing items because Wilk did not believe that there was anything of value on the property.[7] When the Thomases, six months after the sifting, retrieved the items that ServiceMaster had stored, the hockey cards, photos, and other paperwork were not there. ServiceMaster told Wilk that it had left those items "on site." Wilk did not believe that those items had any value.

Anthony testified at trial that, when the Thomases met with Wilk at the property a few days after the fire, he saw one of his statues in the debris. Wilk told him to leave it there. Anthony told Wilk about his "millions of dollars' worth of emeralds . . . ." Wilk told him that "she was going to have a company come in and sift through the property. And they were going to go through and get all the contents and items, emeralds. And that they were going to put them in a facility and they were going to have them evaluated, and then they would return them to us after they did that." Anthony testified that Wilk told him that ServiceMaster would "do a sift to find the emeralds" and would be searching "the whole property."

---

[7]     Anthony testified that Wilk had prohibited them for several months from being on the property or taking anything from the property and had said that FIE was going to secure the property. However, he had already had his brother retrieve the gun safe from a neighbor who had removed it from the property.

14

Wendi Thomas testified that she was at the property for about five minutes on the afternoon of the day when ServiceMaster was doing its work. She did not see Wilk present. She called Anthony because she saw several men "with shovels with black duffel bags," and the men were "picking up stuff." Anthony told her "he was on a job and couldn't come out then."

However, Anthony testified that he "went out there when Service Masters [*sic*] was doing their work and I watched them gather bags and stuff and take them off the property." Wilk was not present when he arrived at the property in the afternoon and saw ServiceMaster removing bags from his property. "I didn't see what they were putting in the bags, but they had lots of stuff that they were putting into those bags, and none of that stuff that they put in bags was returned to me." He saw 10 or 15 "duffel bags" of "stuff" being removed from the property. He could not tell what was in the bags. He testified at trial that he thought at the time that ServiceMaster had "recovered a significant amount of emeralds" and believed that ServiceMaster was holding these emeralds for him. He also believed that his "financial records" "were rescued by [FIE], who was responsible for Service Masters [*sic*]."

Anthony also testified that ServiceMaster "wouldn't let me" retrieve the items recovered from the debris until April 2007, and he found "missing" from those items his "financial documents that showed my ownership of the emeralds" and "emeralds that I believe that they took off the site that I saw on the site that day . . . ." He did retrieve the "bear statue," but ServiceMaster did not have the "large stone," the other statue, except for a piece of it, the hockey trading cards, the "pictures," and the "financial papers." The "bear statue' was missing jewels that had been in its eyes and mouth. Anthony "didn't think that's all [ServiceMaster] got off the property."

The court instructed the jury that, to prove negligence, the Thomases had to prove that "[FIE] and/or Higashi were negligent." The court instructed the jurors on the conversion cause of action that the Thomases had to prove that FIE "intentionally and

15

substantially interfered with" the Thomases' property "by taking possession of the emeralds, statues, and/or trading cards for a significant period of time or preventing [the Thomases] from having access to" this property "for a significant period of time or destroying" this property "or refusing to return" this property "after [the Thomases] demanded its return." The Thomases also had to prove that FIE's "conduct was a substantial factor in causing [the Thomases'] harm."

The jury was instructed about agency solely with respect to Higashi and Wilk. "A corporation is responsible for harm caused by the wrongful conduct of its agents while acting within the scope of their authority. [¶] [The Thomases] claim that they were harmed by Edwin Higashi and/or [Wilk's] negligence and/or the intentional wrongdoing. [¶] [The Thomases] also claim that [FIE] is responsible for the harm because Edwin Higashi was an agent of [FIE] and [Wilk] was an employee working on behalf of [FIE] when the incident occurred." "In this case, Edwin Higashi was an agent of [FIE], and [Wilk] was an employee working on behalf of [FIE]." The court instructed the jury that FIE was responsible for actions of Higashi and/or Wilk if they "were acting within the scope of their agency or employment when they harmed" the Thomases. The jury was also instructed that "[FIE] . . . cannot avoid responsibility just because some other person, condition, or event was also a substantial factor in causing [the Thomases'] harm."

The Thomases argued to the jury that the negligence cause of action against FIE alone was based on FIE's "failing to secure the property." They argued that the conversion cause of action was based on FIE "taking the property, passing it on to Service Master [*sic*] and never returning it." The Thomases claimed that FIE was negligent because Wilk told them to stay off of their property, not to remove anything, and that FIE would be securing the property and arranging for a "fine sift" of the debris. They also asserted that FIE "would have found the emeralds if they conducted any reasonable type of search." "So that means somebody took them." "[FIE] did nothing to protect their property. Despite saying so, they did absolutely nothing to protect their

16

property.  And they should have.  Once they said they were going to, they should have kept their word."  "Completely negligent search."  The Thomases argued that "an agent is just what we think it is.  It's an employee, or it's a person who represents another company and speaks on their behalf."  They did not argue that ServiceMaster was FIE's agent.

FIE argued to the jury that it had not been negligent in "handling the sifting of debris, and . . . in supervising Service Master [*sic*] in the search for valuables on the property."  FIE conceded that plaintiffs had proved that "they owned emeralds, statues, or trading cards," the first element of conversion.  FIE argued that it had "ask[ed] Service Master to take possession" of some of these items, but FIE "never took possession of those things."  "If plaintiffs have a criticism of Service Master [*sic*] for not having kept these things safe, they could have, should have sued Service Master [*sic*]."  "[I]f plaintiffs had a beef with Service Master [*sic*], who was charged with taking these things away from their property, they had a way to air those complaints."  "There is no evidence . . . that [FIE] was negligent in . . . the asking of Service Master [*sic*] to take charge of these few items of personal property that were left there."

During deliberations, the jury submitted a question to the court asking:  "Is [FIE] liable for subcontract company such as Service Master [*sic*]?"  The trial court consulted with the parties regarding this question.  FIE's position was that "unless [FIE] was negligent in the selection of a subcontractor, there is no liability for the principal for the potential or alleged negligence of a subcontractor."  The Thomases sought time to research the issue.  They asserted:  "The trouble is we really didn't instruct them on independent contractor and agent and stuff like that, you know.  And I'm thinking maybe we should take a look at those jury instructions too."  The court's initial position was "the answer to the question is no," but it agreed to listen to "whatever you come up with tomorrow."

17

The next morning, the Thomases argued: "What I'm concerned about is I don't know if the question relates to the search of the property for the emeralds. And the testimony in that regard was that [Wilk] maintained control over the search of the property, monitored the activities of Service Master [*sic*], and, in fact, with Service Master [*sic*] told them what -- what process they could use." "The other is if the question relates to if Service Master [*sic*] lost the stuff at their premises after they took it. And our position is that when [FIE] took the property a bailment was created and [FIE] was the bailee. And [FIE]'s obligation is to redeliver the property to us on demand. The fact that they give it to somebody else for safekeeping is irrelevant to that issue." They asked the court to instruct the jury that "ordinarily a principal is not liable for the negligence of an independent contractor. However, if a principal retains control over the way the work is performed, then the principal is liable for his negligence in supervising the recovery effort . . . ."

FIE asserted that the answer to the jury's question was "no" because otherwise "we would in effect be making [FIE] the insurer of Service Master . . . ." It argued that the "long-standing general rule in California is that a principal is not liable for the torts of its independent contractors." The court agreed with FIE that the answer to the question was no.

## 2. Analysis

The Thomases claim that the trial court prejudicially erred in responding "no" to the jury's question because there were factual issues about FIE's potential vicarious liability for ServiceMaster's actions. The problem with the Thomases' alleged vicarious liability theory is that they did not plead it in the operative complaint, did not assert it at trial, did not argue it to the jury in their opening or closing argument, did not request instructions on it, and did not include any pertinent questions concerning it in the extensive special verdict form. The trial court's response to the jury was essentially correct in telling the jury that this issue was not before it. While there could have been

18

factual questions about whether ServiceMaster engaged in tortious conduct that caused harm to the Thomases, any such questions were not among the issues before the jury in this trial. Under these circumstances, the trial court did not prejudicially err in providing a response to the jury that properly excluded this unpleaded, untried, unargued issue from the jury's purview.

## IV.  Disposition

The judgment is affirmed.

_____

Mihara, J.

WE CONCUR:

_____

Elia, Acting P. J.

_____

Grover, J.